**Frank J. KELLEY, Attorney General of the State of Michigan; and the State of Michigan, Plaintiffs,**

**v.**

**THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Solvent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC Transportation, Inc.; Richard E. Thomas; and Grand Trunk Western Railroad Company, Defendants.**

GRAND TRUNK WESTERN
RAILROAD COMPANY,
Counter Plaintiff,

v.

Frank J. KELLEY, Attorney General of the State of Michigan; and the State of Michigan, Counter Defendants.

GRAND TRUNK WESTERN
RAILROAD COMPANY,
Cross Plaintiff,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Solvent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC Transportation, Inc.; and Richard E. Thomas, Cross Defendants (Two Cases).

THOMAS SOLVENT COMPANY and Richard Thomas, Counter Plaintiffs,

v.

GRAND TRUNK WESTERN RAILROAD COMPANY, Counter Defendant (Two Cases).

GRAND TRUNK WESTERN
RAILROAD COMPANY,
Third–Party Plaintiff,

v.

Richard E. THOMAS, as Trustee of The Richard E. Thomas Living Trust; The Richard E. Thomas Living Trust; and Letha Thomas, Third–Party Defendants (Two Cases).

UNITED STATES of America, Plaintiff,

v.

THOMAS SOLVENT COMPANY; Thomas Development, Inc.; Thomas Solvent Company of Detroit, Inc.; Thomas Sol-

vent Company of Muskegon, Inc.; Thomas Solvent, Inc. of Indiana; TSC Transportation Company; Richard E. Thomas.

Nos. K86–164, K86–167.

United States District Court,
W.D. of Michigan.

Aug. 19, 1989.

See also, —— F.Supp. ——.

Frank J. Kelley, Atty. Gen. by Robert P. Reichel, Asst. Atty. Gen., Environmental Protection Div., Lansing, Mich., John S. Smietanka, U.S. Atty. by Julie Ann Woods, Grand Rapids, Mich., Joel M. Gross, Steven J. Willey, Environmental Enforcement Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C. (Roger Grimes, Asst. Regional Counsel, U.S. E.P.A., Chicago, Ill., Jessie A. Goldfarb, U.S. E.P.A., Office of Enforcement & Compliance Monitoring, Washington, D.C., of counsel), for plaintiffs.

Foster, Swift, Collins & Coey, P.C. by Charles E. Barbieri, John L. Collins, Lansing, Mich., for Thomas Solvent Co. & Richard E. Thomas. Sullivan, Hamilton & Schulz by James M. Sullivan, Battle Creek, Mich., for Thomas Development, Inc., Thomas Solvent Co. of Detroit, Inc., Thomas Solvent Co. of Muskegon, Inc., Thomas Solvent, Inc. of Indiana and TSC Transp. Co.

Bodman, Longley & Dahling by Fredrick J. Dindoffer, R. Craig Hupp, and Mary P. Sclawy, Detroit, Mich., for Grand Trunk Western R. Co.

Bremer, Wade, Nelson & Alt by Michale D. Wade, Grand Rapids, Mich., for Great American Surplus Lines Ins. Co. intervening non-party and non-participant.

## OPINION

ENSLEN, District Judge.

This case is currently before the Court on plaintiffs United States and the State of Michigan's Motion for Further Relief related to the fraudulent conveyance claim I decided on December 2, 1988. At that time, I found that in 1982, the Thomas Solvent Company, under the direction of Richard Thomas, transferred the bulk of its assets to four spinoff corporations, with actual intent to defraud, hinder, or delay creditors. The parties then briefed the issue of remedies related to the fraudulent conveyances claim.

On January 12, 1989, the Court ordered that:

1) The Thomas Solvent spinoff companies, Richard Thomas, his Trust and Letha Thomas were enjoined from any transfers of assets except in the ordinary course of business and for fair consideration;

2) Plaintiff and Grand Trunk were permitted additional discovery relating to remedies; and

3) The parties were permitted, after the discovery, to submit briefs on possible supplemental remedies.

Plaintiffs report that the additional discovery has been completed, and it "reveals a course of conduct by Richard Thomas, since the spinoff conveyances, of transferring with the intent of further delaying, defrauding and hindering creditors." Plaintiffs maintain that it is unlikely that complete mitigation of this harm can be achieved. In order to "secure the remediation that is still possible," plaintiffs ask that the Court order the following relief:

1. Direct Thomas, his trust, and each of his companies to file a monthly financial report with the Court;

2. Bar payment to Thomas of a bonus of any kind from any of the Thomas Solvent companies;

3. Order the reduction of the current amounts being paid to Mr. Thomas as so-called "salary" by the Thomas Solvent spinoff companies, to better reflect the substantially reduced workload currently un-

dertaken by Mr. Thomas on behalf of the companies and to insure that the companies are not in reality paying Mr. Thomas dividends;

4. Direct Thomas to supply copies of the preliminary injunction and any further order to the current managers of the Thomas Solvent companies—John Thorpe, Stephen Litchfield, and Herman Remus; and

5. Order that, within thirty days of this Court's ruling on the relief sought in this brief, plaintiffs and Grand Trunk may file amended or supplemental complaints in these actions for the purpose of asserting claims against, and bringing before the Court, persons who have received conveyances from Thomas, directly or indirectly, but who are not currently parties to these proceedings.

## DISCUSSION

*Factual Background*

After discovery, plaintiffs set forth the following facts related to the request they have presented to the Court. To begin with, plaintiffs report that while it has not been possible to determine exactly how much money Thomas has conveyed to his wife between January 1982 and the present time, Thomas, when asked to approximate, testified that it was "at least in the vicinity of two million." R. Thomas Deposition, Exhibit 3, at 44–45 (March 22–23, 1989). In addition, each of the Thomas's three sons has received some $90,000, at minimum, since January, 1982.[1]

Plaintiffs next report that "[t]ime and time again, even when his records of those of financial institutions with which he did business were available to him, Mr. Thomas, at his deposition, could not answer questions concerning his finances and his reasons for reorganizing those finances." Plaintiffs' Second Supplemental Brief, at 5–6 (April 11, 1989). The Court is dis-

mayed to observe what appear to be evasive answers to a string of relevant and important questions concerning this matter. Thomas, as sole trustee for the trust, was asked whether the environmental liability played any role in his transferring assets out of the trust:

Q. Did the pendency of these lawsuits, and by that I mean the suits under which we're taking your deposition today, play any role as part of the estate planning you did to reduce this value of the trust?

A. I don't recall.

Q. You don't recall.

A. I don't recall whether it did or not.

R. Thomas Deposition, Ex. 2, at 216 (Feb. 21–22, 1989).

Likewise, Thomas stated that he could not recall whether potential environmental liability caused him to make any conveyances to his wife:

Q. Can you think of any other reason or motivation that led you to convey any part of that $2 million?

A. I guess I don't recall any other today.

Q. Did any concern you might have had about exposure to environmental liability relating to the Verona Well Field problem generally play any role in your conveyances to your wife?

... [objection to relevance placed on the record]

A. It could have.

Q. Why do you say that?

A. Because I don't know whether it did or not, I say it could have.

R. Thomas Deposition, Ex. 2, at 110–11.

In 1986 or 1987, the Thomases sold their Battle Creek home for $82,500 and purchased a Dallas condominium for $1,750,-000. Answer to Interrogatory No. 15, Ex. 8 (First Set). Thomas would not state whether he specified a preference for par-

---

1. Subsequent to January 1, 1982, each of the Thomas's three sons has received stock or cash worth, at a minimum, $90,000, for an aggregate in excess of $270,000. Of this amount, $50,000 was conveyed to each son by Mr. Thomas, in annual units of $10,000, during 1985–89. The

remaining $40,000 of each $90,000 was conveyed to each son by Mrs. Thomas, also in annual units of $10,000, during 1986–89. Apparently some of those funds, however, were conveyed from Thomas to his wife.

ticular features in the dwelling he sought in Dallas:

Q. What sort of instructions did you give [the realtor]?

A. Find me something I'd like to buy.

Q. Anything beyond that?

A. I don't know. Whatever the normal arrangements are between a buyer and a realtor.

Q. And in this case what were those?

A. Whatever is a common practice.

Q. Well, did you specify a number of rooms or a style of dwelling unit?

A. I think so.

Q. Do you recall what you specified?

A. Either a residence or a condominium, I think.

Q. Did you specify a price range?

A. Well, to some degree, yes.

Q. To what degree did you specify a price range?

A. I don't recall.

Q. What is your best guess?

A. I don't recall.

Q. So as you sit here today you have no idea what price range you gave this realtor to be looking for as a part of this search for a dwelling unit?

A. I don't recall what range.

R. Thomas Deposition, Ex. 1, at 163–64.

As a third factual matter bearing on the resolution of this request, plaintiffs report that for each of the last several years, Thomas's annual gross salary from the Thomas Solvent companies has totalled $150,000 to $162,000. Braza Deposition, Ex. 4, at 46 (March 23, 1989); R. Thomas Deposition, Ex. 2, at 271; Answer to Interrogatory No. 4, Ex. 8 (First Set).[2] Plaintiffs argue that again, Thomas would not estimate how much time he spends on Thomas Solvent business:

Q. ... How much time do you spend working on Thomas Solvent Company business activities?

A. A lot.

Q. Well, what percentage of your time?

A. I don't know.

Q. Roughly?

A. I don't know.

R. Thomas Deposition, Ex. 2, at 193.

Further, plaintiffs suggest that according to testimony from managers at the Thomas Solvent companies, during the seventy percent of the time Thomas is in Dallas, or otherwise away from Michigan, the companies can account for only small amounts of Thomas's time.[3]

Fourth, plaintiffs point out that the Thomases explain several reasons for their recent move to Texas. Plaintiffs stress that Thomas and his wife testified about the Texas Homestead Exemption and their understanding of how that state's provision would shield the family assets:

A. Another reason you gave among the list of things that helped you decide to

---

2. In addition, Thomas normally tried to secure for himself an annual bonus of about $100,000 —to the extent that the earnings of the Thomas Solvent companies could support such an outlay. Brazda Deposition, Ex. 4, at 46–47 (March 23, 1989). Thomas gave himself bonuses in each of the last six years, except in 1988. Answer to Interrogatory No. 4, Ex. 8 (First Set).

3. For example, while Thomas is in Texas, he speaks with Stephen Litchfield, the manager of Thomas Solvent Inc. of Indiana only about five or six times per month. Those telephone conversations, while they vary in length, range from about one to fifteen minutes in length. Litchfield Deposition, Ex. 5 at 37–38 (March 30, 1989).

   Thomas speaks with John Thorpe, the manager of Thomas Solvent Company of Detroit, Inc., a bit more frequently, though from time to time a week will pass without any communication between them. The number of calls varies from none to three or four per week. Also, the length of their conversations varies, some take only ten to fifteen minutes but none of the calls normally exceeds 45 minutes. Thorpe Deposition, Ex. 6, at 11, 15 (March 19, 30, 1989). Nor can the comptroller of all the Thomas Solvent companies, Herman Remus, account for very much of Thomas's time while Thomas is in Texas. Though the frequency and length of the Remus–Thomas telephone calls do vary, Mr. Remus stated that, on average, he would not converse with Thomas more than about twenty minutes per week. Remus Deposition, Ex. 1, at 13–14 (March 14, 1989).

   In contrast, Mr. Remus notes that Mr. Thomas puts in regular working hours when he spends time at one or another of the Thomas Solvent facilities. Mr. Thomas makes such appearances approximately every two months. *Id.* at 22–23, 76–77.

move to Texas was the protectiveness of Texas laws; do you recall stating that?

A. Yes....

Q. Anything else?

A. And all the other laws that they offer their citizens.... I think the treatment of citizens in regard to the sovereignty of the domain.

Q. Could you explain what you mean by sovereignty of the domain?

A. The protectiveness the state has in regards to the place you live.... I believe they refer to it as the Homestead Act.

Q. And how do you understand that to work?

A. I understand that to work that they have a different opinion of their citizens as to protectiveness of their investment and the place they live in regards to creditors.

R. Thomas Deposition, Ex. 2, at 153–54. *See also* C. Thomas Deposition, Ex. 7, at 13–14 (March 22, 1989).

Finally, plaintiffs report that in February 1989, approximately six weeks after this Court's preliminary injunction was issued, Thomas had not yet taken steps to advise the managers of the Thomas Solvent companies about the injunction and its provisions. R. Thomas Deposition, Ex. 2, at 257. According to Thomas, he had not informed his employees of the injunction because he controlled the assets of the corporation. Plaintiffs observe, however, that at least one other employee of the Thomas Solvent companies is authorized to disburse funds by signing checks. Herman Remus, comptroller for all the companies, signs such checks in that capacity, but also signs for Thomas by use of a signature stamp. Remus Deposition, Ex. 1, at 31–35, 54, 84–85 (March 24, 1989). Plaintiffs report that Remus did not receive instructions about the injunction until late February 1989 and that Stephen Litchfield and John Thorpe, managers of Thomas Solvent of Indiana and Detroit, have not been shown the injunction. Litchfield Deposition, Ex. 5, at 8–9 (March 30, 1989); Thorpe Deposition, Ex. 6, at 10–11, 21–22 (March 30, 1989).

*Law*

■ The relief sought by plaintiffs is governed by the Michigan Fraudulent Conveyance Act. That Act provides for potential remedies a court may order for creditors whose claims have not yet matured. The relevant provision provides:

566.20 Rights of creditors whose claims have not matured

Sec. 10. Where a conveyance made or obligation incurred is fraudulent as to a creditor whose claim has not matured, he may proceed in a court of competent jurisdiction against any person against whom he could have proceeded had his claim matured, and the court may,

(a) Restrain the defendant from disposing of his property,

(b) Appoint a receiver to take charge of the property,

(c) Set aside the conveyance or annul the obligation, or

(d) Make any order which the circumstances of the case may require.

Mich.Comp.Laws § 566.20.

Pursuant to Mich.Comp.Laws § 566.20(a), the Court has already entered an order restraining defendants from disposing of property without fair consideration or outside the ordinary course of business. The Court has also granted plaintiffs' request for expedited discovery under subsection (d). The instant relief is requested based upon the results of expedited discovery.

### 1. *Monthly Financial Reports*

Defendant Thomas Solvent Company and Richard Thomas object to plaintiffs' request that Richard Thomas and each of the Thomas Solvent spinoff corporations file monthly financial reports. The remaining defendants have no objections to that requirement, but would have the Court add some practical methodology for the parties supplying the reports.

I believe plaintiffs' request is reasonable and is the most efficient way for the parties to monitor the Thomas defendants' compliance with the Court's injunctive order. Although it is true that there is no

current allegation of noncompliance, defendants' past conduct make the probability of non-compliance greater than it would be otherwise. Also, the Court observes an unfortunate recalcitrance on the part of defendant Richard Thomas as evidenced by his unlikely lack of information about his personal and business affairs in the deposition testimony. Thus, for these reasons, I will grant plaintiffs' request for monthly reporting requirements.

I agree with defendants, however, that the methodology for the monthly reports should be altered a bit from the way plaintiffs have requested it. Therefore, the Thomas defendants shall have twenty one days to prepare the monthly statements.

### 2., 3. *Richard E. Thomas's Salary/Bonus*

■ Plaintiffs ask this Court order the spinoff corporations to cut Richard Thomas's salary in half to $81,000 per year and to refrain from paying Thomas a bonus. According to plaintiffs, the spinoffs' continued payments of salaries totalling some $162,000 per year "are transfers or dispositions made for inadequate consideration." Plaintiffs support their request by stating that the testimony from managers running the spinoff corporations indicates that defendant Thomas spends, on average, only a few hours each week performing identifiable activities or services on behalf of the corporations.

Plaintiffs have chosen the figure of $81,000 per year as appropriate consideration for Thomas's contribution to the spinoff corporations as chief executive officer. They chose this figure as representing half of what Thomas earned when he worked full time and lived in Michigan. Defendants refer to deposition testimony that establishes that Thomas is a "vitally responsible" chief executive officer whose services are valuable "because of his education, knowledge, and experience." I believe defendants quite correctly point out that the services of a corporate officer are difficult to measure, and are not always related to hours-per-week worked. The definition of "work" is in itself a fuzzy concept—as defendants argue, problem-solving, policy development, or other business planning may be performed in places other than in an office in Battle Creek. I also do not see evidence that suggests Thomas works half or less of the hours he did while he was in Michigan.

For these two reasons, I cannot at this time find that defendant Thomas's salary or bonuses are a disposition without consideration. I must therefore deny this part of plaintiff's request.

### 4. *Injunctive Order Served on Managers*

Plaintiffs suggest that the management of the spinoff corporations are not properly informed of this Court's January 1989 injunctive order. In spite of the managers' apprehension about their future employment, those who have authority to write checks or otherwise disburse money should absolutely be provided with the terms of the Court's injunctive order. Apparently this is no longer a problem with regard to Herman Remus, however, anyone else authorized to write checks or disburse money should receive the injunction, as well as any and all orders supplementing or modifying it. In addition, as a form of enforcement of sorts, I believe those with management level positions should likewise be aware of the terms of the injunction. I will grant this part of plaintiffs' request.

### 5. *Addition of Parties*

Plaintiffs argue that to pursue the rights of the United States and the State of Michigan under the Fraudulent Conveyance Act, they must be able to "both trace and then seize the assets fraudulently conveyed by Thomas Solvent Company to the spinoff corporations, by the spinoff corporations to Richard Thomas, and by Mr. Thomas to other members of his family." These assets, according to plaintiffs, have been transferred to Thomas's wife and children without fair consideration and outside the ordinary course of business. Defendants object to this remedy, maintaining that the gifts to the children were made for the purposes of estate planning. They add

that Carol Thomas, defendant's wife, is not a party to any fraudulent conveyance.

Discovery thus far has revealed that defendant Thomas has conveyed to his wife since January 1982 some $2,000,000. R. Thomas Deposition, Ex. 3, at 44–45 (March 21–22, 1989). To his sons, Thomas has conveyed an aggregate in excess of $150,-000 since 1982. Answer to Interrogatory No. 5, Ex. 8 (first set); C. Thomas Deposition, Ex. 7, at 24–25 (March 22, 1989). `I believe that plaintiffs are entitled to bring suit against these parties under the Fraudulent Conveyance Act as recipients of fraudulently conveyed assets. Section 566.20 of the Act provides that:

566.20 Rights of creditors whose claims have not matured

Sec. 10. Where a conveyance made or obligation incurred is fraudulent as to a creditor whose claim has not matured, he may proceed in a court of competent jurisdiction against any person against whom he could have proceeded had his claim matured, and the court may,

(a) Restrain the defendant from disposing of his property,

(b) Appoint a receiver to take charge of the property,

(c) Set aside the conveyance or annul the obligation, or

(d) Make any order which the circumstances of the case may require.

Mich.Comp.Laws § 566.20.

■ This statute, in order to protect the rights of creditors whose claim have not yet matured, allows a creditor to proceed against *any person* against whom he could have proceeded had his claim matured. It is well established that a grantee who receives property or money without giving fair consideration to the fraudulent grantor is subject to having the conveyance set aside and to any other remedies normally available to the defrauded creditor. *See, e.g., United States v. West*, 299 F.Supp.

661, 667 (D.Del.1969). Plaintiffs could proceed against Thomas's family members after a judgment, arguing that they "stand in the shoes of the actual fraudulent grantee." *Id.* at 668.[4]

■ It is also true that the law quite understandably must closely scrutinize transactions between family members when the rights of creditors are involved. *Linke v. Goodrich*, 30 Mich.App. 228, 186 N.W.2d 5 (1971); *Brydges v. Emmendorfer*, 311 Mich. 274, 18 N.W.2d 822 (1945); *Bentley v. Caille*, 289 Mich. 74, 286 N.W. 163 (1939); *Farrell v. Paulus*, 309 Mich. 441, 450, 15 N.W.2d 700 (1944). And, in addition, given the history of unsavory transactions; the enormity of sums passing from defendant Thomas to members of his family without adequate explanation; and defendant Thomas's lack of forthrightness in the recent depositions, the Court is hardly without a reason to scrutinize closely the streams of funds which have flowed out of the Thomas Solvent Company.

Finally, any new claims against these parties will be inextricably tied to the fraudulent conveyance claims, and it is therefore in the interests of judicial economy to allow such amended or supplemental pleadings. I will therefore allow plaintiffs to amend or supplement their pleadings as they have requested.

## ORDER

On January 4, 1989, the Court granted plaintiffs' and Grand Trunk's motions for an injunction restraining defendants Thomas Development, Inc., Thomas Solvent Company of Detroit, Inc., Thomas Solvent of Muskegon, Inc., Thomas Solvent Inc. of Indiana, TSC Transportation, Inc. ("spinoff corporations"), Thomas Solvent Company, Richard E. Thomas, Richard E. Thomas Living Trust, and Letha Thomas from declaring or paying dividends, making any

---

4. The Court is therefore not convinced by defendants' argument that courts should only allow fraudulent conveyance actions to be filed against recipients of conveyances upon entry of judgment against the actual fraudulent grantee. The policy and purpose behind the Fraudulent Conveyance Act is to make available to a creditor with a claim matured *or unmatured,* a remedy which previously was not available until the creditor has reduced his claim to judgment. *Churchill v. Palmer*, 57 Mich.App. 210, 214, 226 N.W.2d 60 (1974). Also, the Act is remedial and should be given a liberal construction. *Id.*

distributions, and from wasting, transferring, or disposing of any assets or property, including real, personal, tangible, or intangible, whether encumbered or unencumbered, outside the ordinary course of business, or for inadequate consideration during the pendency of this litigation or until further order of the Court.

The Court also granted, plaintiffs' and Grand Trunk's motions for expedited discovery on January 4, 1989 and requested that supplemental briefs as to additional remedies be submitted by April 10, 1989.

The plaintiffs and Grand Trunk have undertaken expedited discovery and requested further relief from the Court. The Court has heard the arguments of counsel and read their briefs, and is fully advised in the premises.

IT IS ORDERED that Richard E. Thomas, individually and as trustee of the Richard E. Thomas Living Trust, shall serve upon all counsel, and file with the Court, monthly financial reports on the twenty-first day of every month. The reports to be filed by Mr. Thomas shall, as a minimum, fully disclose:

(a) all payments of any description received by Mr. Thomas, individually or as trustee of his living trust, from any of the spinoff corporations;

(b) the reason(s) for such payment and the consideration provided for such payment;

(c) the disposition of each such payment by Mr. Thomas, including specific identification of the account(s) into which the payment was deposited (including name, financial institution, and account number);

(d) the amount of and reasons for any payment by Mr. Thomas to any member of his family; and

(e) all payments, gifts, disbursements, or loans made by Mr. Thomas, individually or as trustee of the Richard E. Thomas Living Trust, to any person or entity, in the amount of $5,000.00 or more.

IT IS FURTHER ORDERED that each of the spinoff corporations shall serve upon all counsel, and file with the Court, monthly financial status reports on the twenty-first day of every month. The reports to be filed by each spinoff corporation should, as a minimum, include:

(a) a copy of any monthly financial reports normally prepared by or for the Company;

(b) the amount(s) of any payment to Richard Thomas, his living trust, or any member of his family;

(c) the reasons for and consideration received for each payment described in (b), *supra;* and

(d) the amount, receipt, and consideration received for any payment in excess of $5,000.00 by that Company to any other person or entity.

IT IS FURTHER ORDERED that a copy of this Order and the Court's Order of January 12, 1989—which remains in effect—shall be served on all persons who manage any of the spinoff corporations or who have authority to issue checks or transfer assets from any of the spinoff corporations.

IT IS FURTHER ORDERED that plaintiffs and Grand Trunk may, within thirty (30) days after entry of this Order, file amended or supplemental pleadings to add as additional defendants any persons or entities which they allege have received conveyances of assets, directly or indirectly, from Thomas Solvent Company, Richard Thomas, or the Richard Thomas Living Trust.