**In re Eugene T. RICHARDS, Jr. and Mary Ellen B. Richards, Debtors.**

**Mark Burke Richards, Intervenor–Appellant,**

**v.**

**United States of America, Appellee.**

**No. Civ.A. 98–5148.**
**Bankruptcy No. 97–14798DWS.**

United States District Court,
E.D. Pennsylvania,
Philadelphia Division.

Jan. 29, 1999.

---

Mark L. Tunnell, Gawthrop, Greenwood and Halsted, West Chester, PA, John R. Crayton, Crayton and Belknap, Bensalem, PA, for Mary Ellen B. Richards, debtor.

John R. Crayton, Crayton and Belknap, Bensalem, PA,, for Eugene T. Richards, debtor.

Roger N. Huggins, Gawthrop, Greenwood and Halsted, West Chester, PA, for Mark Burke Richards, intervenor–appellant.

Charles M. Flesch, Tax Division of U.S. Dept of Justice, Washington, DC, for United States, U.S. Dept. of Justice, Tax Div., appellee.

Edward Sparkman, Philadelphia, PA, trustee pro se.

## *OPINION*

BUCKWALTER, District Judge.

## I. INTRODUCTION

After a trial on the merits, the United States Bankruptcy Court for the Eastern District of Pennsylvania held that the debtors' trust, the corpus of which is real property, is their nominee as co-trustees for the benefit of their minor son, even though it had previously found that the trust was validly created and not a sham, and that the conveyance of the property to the trust was not fraudulent. The minor son, who intervened in the proceedings below, now appeals from this determination. For the reasons discussed below, the decision of the Bankruptcy Court, holding that the trust is the debtors' nominee, is AFFIRMED.

## II. JURISDICTION

This Court has jurisdiction over appeals from final judgments, orders, and decrees from the Bankruptcy Court. *See* 28 U.S.C. § 158(a). Jurisdiction is also proper under the collateral order exception to the final judgment rule. *See In re Sacred Heart Hosp. of Norristown,* 133 F.3d 237, 241 (3d Cir.1998). Although the August 18, 1998 order from which this appeal arises is not "final" in the sense that the Bankruptcy Court did not fully dispose of the contested matter in the underlying proceedings, the Court agrees with Appellee, *see* Appellee's Br. at 1 n. 1, that the order is nonetheless appealable as the decision contained therein was effectively a preclusive decision on the merits, *see F/S Airlease II, Inc. v. Simon,* 844 F.2d 99, 103 (3d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).

## III. FACTUAL AND PROCEDURAL HISTORY

### A. *Factual History*

Debtors Eugene T. Richards, Jr. ("Husband") and Mary Ellen B. Richards ("Wife") were married in 1979. At that time, Wife was 38 years old, pregnant with their son, and employed by Bell of Pennsylvania as an instructor. Husband was 27 years old and was a real estate broker. The Richards decided that Wife would retire from her job to stay at home to care for their son and Husband would remain responsible for supporting the family. They further agreed that Wife's assets, which included a home in Avalon, New Jersey, would remain her separate property.

After their son, Mark Burke Richards, was born on August 23, 1979, Wife sold the home in Avalon and bought another property near the beach. She also acquired another property at some other point in time, but the family only resided in one of these properties. When Husband decided to open a restaurant business, Wife sold the residence they were not using to finance his acquisition of a pre-existing restaurant. However, the business failed and the Wife's sole remaining property, the one in which the family resided, was foreclosed upon. Husband was left with debt from the failed business of approximately $80,000, exclusive of employment tax liabilities owed to the IRS. Husband subsequently returned to the real estate business and the family moved to a two-bedroom apartment. According to Husband, he felt financially responsible for Wife losing her home.

By 1984, the couple realized that Mark would be their only child. Wanting him to grow up near his cousins, they subsequently purchased a home located in Chester Springs, Pennsylvania ("Residence") for a purchase price of $96,000. This amount was financed by granting a mortgage on the Residence ("First Mortgage") to Financial Mortgage Services in exchange for $91,200, with the balance and closing costs being paid in cash. In May 1984, the Richards began making payments under the First Mortgage, which included escrow for real estate taxes and homeowners' insurance. On or about June 5, 1984, the First Mortgage was assigned to Norwest Mortgage, Inc. ("GMAC").

From May 1984 to the present, the Richards have continuously resided in the Residence with their son. Indeed, not only is the Richards' furniture in the home, but Husband has used part of the Residence as a home office. In addition, since 1984, the Richards have used their personal funds to pay the mortgage, real estate taxes, and utility bills for the Residence, including the telephone, electric and heating bills, which are in one or both of their names. From May 1984 until August 1997, the Richards have also continued to maintain homeowner's insurance on the Residence with both Husband and Wife listed as the named insureds.

Shortly after purchasing the Residence, the Richards discussed putting the home in trust for their son. According to them, their intent in so doing was not to evade creditors but to ensure that Mark would have the house to live in no matter what happened to them. Husband then contacted an attorney and advised him that they wanted to deed the Residence in trust for their son. An appropriate deed was prepared and, on or about December 6, 1984, the Richards transferred title to the Residence from themselves to themselves as trustees for their five-year-old son, for a consideration of $1.00. Although the deed was then duly recorded in Chester County, the Richards did not separately contact GMAC to advise it of the transfer. Husband claims, however, that he provided GMAC with indirect notice of the transfer through tax bills that reflected the trust.

Concomitantly, the Richards were liable for $2,734 in federal income taxes for the tax year ending 1983. Husband was also liable for employment taxes in connection with the failed restaurant amounting to over $20,000 for the tax periods ending June 30, 1982, September 30, 1982, and December 31, 1982. Husband made periodic payments towards these liabilities and, by March 20, 1987, the assessed federal income tax liability, including interest and penalties, was paid in full. On January 1, 1988, Husband entered into an Installment Agreement with the IRS, obligating him to make monthly payments of $400 towards the remaining outstanding taxes. The IRS' records show that he indeed made approximately 20 payments in compliance with this agreement. Additionally, Husband signed a Tax Collection Waiver form with the IRS agreeing to extend the statutory period applicable to the employment tax liabilities until December 31, 1999.

On or about January 1, 1989, the Richards applied for a home equity loan of $12,500 from Malverne Federal Savings and Loan Association ("Malverne"). Although Husband testified that he had advised the loan officer that the Residence was held in trust for his son, the loan application unequivocally listed the location of the Residence as the Richards' address and states that they "own"

the home. The application was prepared by an employee of the bank using information obtained from Husband over the telephone or contained in the bank's files, as the Richards had previously applied for, and obtained, a home equity loan from Malverne in January 1986. However, no documentation for that 1986 transaction was available because they had all been destroyed by the bank in accordance with its document retention policy. The couple each signed the application for the 1989 loan and, by doing so, represented under penalty of perjury that the information contained in the application was true. The loan was subsequently approved and, on or about January 15, 1989, the Richards signed a promissory note for it. From the inception of the loan, the Richards used their personal funds to make the payments.

As collateral for the loan, the Richards granted Malverne a second mortgage on the Residence ("Second Mortgage"). The mortgage document, which both Wife and Husband signed, fails to disclose that they hold the property in trust for their son and does not mention the 1984 deed transferring the property from the Richards to themselves as trustees for their son. Rather, it identifies the Richards as owners of the property and refers solely to the deed transferred to them in 1984. According to Malverne's Manager and then Vice President of the Consumer Loan Department, the bank was not aware when it approved the 1989 home equity loan that the Richards did not own the Residence. While a title search conducted in 1989 identified the Richards as the owners of the home, a subsequent search performed in 1991 disclosed the existence of the trust.

In 1990 and 1991, the Richards fell behind on their mortgage payments on both the First and Second Mortgages. In 1990, GMAC instituted foreclosure proceedings against them based on the First Mortgage, naming the Richards in their capacity as mortgagees and as trustees for their son. Husband then contacted an attorney and requested assistance in resolving the matter. The Richards ultimately entered into an agreement with GMAC to have the foreclosure suit discontinued, proceeding solely in their capacity as mortgagors and *not* as representatives of the trust. In 1991, Malverne also instituted foreclosure proceedings against the Richards in their capacity as mortgagors and as trustees for their son. A settlement was reached in that action as well.

In response to these foreclosure actions, the Richards also applied to the Pennsylvania Housing Finance Agency under the auspices of the Homeowners' Emergency Mortgage Assistance Program for loans to avoid the foreclosure. According to Husband, he had advised the housing counselor that the Residence was held in trust. However, the counselor denied ever being so advised. Her denial is supported by the applications, signed by both Husband and Wife, in which they once again inexplicably referred to the Residence as one of their assets. Moreover, the counselor testified that her agency's policy is to require ownership of the residence as condition of granting a loan. In any event, both of the Richards' applications were ultimately denied because they were deemed to be overextended.

For each of the tax years beginning with 1988 through 1995, except for 1990, the Richards filed a federal income tax return on which they: (1) deducted home mortgage interest paid with respect to the GMAC mortgage; (2) deducted real estate taxes paid in connection with the Residence; and (3) deducted expenses incurred in connection with Husband's home office maintained at the Residence. The IRS audited the Richards' 1991, 1992, and 1993 income tax returns, accepting the deductions the Richards had claimed for home mortgage interest and real estate taxes paid in those years. However, the IRS objected to other deductions that were taken and consequently, made adjustments to the Richards' tax liabilities for those years. On September 16, 1996, the Richards consented to the IRS examination results, thereby increasing their tax liabilities for those years. At trial, Husband testified that he had taken the deductions for home mortgage interest and real estate taxes because he thought that the individual who paid the mortgage interest and taxes was the one entitled to take the deductions.

In October 1995, Wife had emergency surgery. According to Husband, this experience prompted the Richards to contact an attorney about estate planning. Husband advised the attorney of the existence of the trust and the attorney prepared a document entitled, "Joint Trust Under Deed." According to Husband, the purpose of this document was to memorialize their intent in 1984 to create the trust. Shortly afterwards, but sometime before February 29, 1996, the Richards signed it and backdated it to December 6, 1984.

Prior to 1998, however, the Richards neither opened a bank account in the name of the trust, nor obtained a taxpayer identification number for it. They also never filed a gift tax return reflecting the transfer or a fiduciary tax return with the IRS. At trial, the Richards testified that they were not aware of any requirement that they do so but rather, believed that all they had to do to effectuate the trust was to execute the deed. According to Wife, neither she nor Husband ever represented to anyone after the transfer in 1984 that they owned the Residence. Quite to the contrary, she stated that they told friends that their son, Mark, owned the house and, when Mark was about ten years old, advised him similarly. Mark also testified that he was involved in certain decisions regarding improvements to the home. Husband testified that he had no idea that the couple's continued payment of all expenses associated with the Residence would place the trust in any jeopardy.

On February 5, 1996, the IRS' Collection Division served a summons on the Richards, requiring them to provide information about their assets, expenses, and liabilities, in connection with the collection of the Richards' outstanding income tax liabilities for the tax years ending 1987, 1988, 1989, and 1994. During a meeting on February 20, 1996, Husband advised the IRS that the couple did not, in fact, own any real estate as they had put their home in trust for their son. Responding to a request by the IRS to provide documentation of this fact, Husband forwarded a copy of the Joint Trust Under Deed to the IRS by letter dated February 29, 1996. However, Husband failed to mention in this letter that the document had been backdated. The IRS did not learn of this fact until Husband was deposed on September 3, 1997.

B. *Procedural History*

On September 16, 1996, the United States filed a complaint against the Richards, individually and as trustees for their minor son, Mark Burke Richards, in the United States District Court for the Eastern District of Pennsylvania, seeking to reduce to judgment assessments for the tax periods ending 1987, 1988, 1989, and 1994, and to foreclose upon the Residence to satisfy the federal tax liens.

On February 14, 1997, the Richards filed an answer to the complaint but, on April 18, 1997, they filed a Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code. Subsequently, the IRS filed a Proof of Claim dated April 30, 1997 and filed amendments to this claim on May 6, 1997, September 19, 1997, and March 18, 1998. The claim, as amended, is for a total of $216,803.73, categorized as follows: an unsecured claim of $7,073.89, a secured claim of $124,495.64, and a priority claim of $85,234.20.

On June 3, 1997, the Richards filed an objection to the IRS' claim. In the objection, Wife contended that the IRS' secured claim should be reduced to exclude the value of the Residence because the couple held title to it only as co-trustees for their son and did not possess any equitable interest therein. On June 26, 1997, the IRS filed a motion to dismiss the bankruptcy proceeding with prejudice, or to modify the automatic stay. Thereafter, the IRS moved for summary judgment with respect to its dismissal motion and the objection. The Richards cross-moved for summary judgment with respect to the same, and their son was granted leave to intervene ("Intervenor-Appellant"). While these motions were pending, Husband moved on November 13, 1997 to have the case voluntarily dismissed as to him. That request, although opposed by the IRS, was granted by the Bankruptcy Court on April 22, 1998.

The Bankruptcy Court thereafter denied the IRS' motion for summary judgment and denied the cross-motion as to the objection,

but granted the cross-motion as to the IRS' dismissal motion. *See In re Richards,* No. 97–14798DWS, 1998 WL 205915 (Bankr. E.D.Pa. Apr. 3, 1998). In disposing of the summary judgment motions, the court made several significant factual findings and legal conclusions, most of which are not being challenged on this appeal.

First, it determined that a valid, passive trust had been created under Pennsylvania law by operation of the 1984 deed. *See id.* at *6–8. As a result, the court held that the Richards possessed no individual interest in the Residence; rather, they held legal title to the property solely by virtue of the trust and for the benefit of their son. Second, the court rejected the IRS' contention that the transfer of the property constituted a fraudulent conveyance under Pennsylvania's then applicable Uniform Fraudulent Conveyance Act ("UFCA"), 12 Pa.Cons.Stat.Ann. §§ 5101–5110. *See id.* at *8–10. The IRS claimed that, because the Richards were jointly liable for $2,734 in federal income taxes for the tax year ending 1983, the transfer was intended to avoid this liability. The court, however, found that the Richards had satisfied the debt to the IRS for their 1983 tax liability and thus, the IRS was no longer a creditor (as that term was defined under the UFCA) and was not entitled to have the transfer set aside as fraudulent. Additionally, the court found that the IRS lacked standing under the UFCA to oppose the transfer of property held as tenants by the entireties based solely on Husband's individual debts.

Third, the court rejected the IRS' contention that its lien attached to the Residence because the trust had no economic substance and was, therefore, a sham. *See id.* at *10–12. Using a test enunciated in *Markosian v. Commissioner of Internal Revenue,* 73 T.C. 1235, 1243–45, 1980 WL 4562 (1980), the court determined that certain factors were absent and thus, the IRS could not maintain the sham trust theory. Although the court naturally found that there was no independent trustee to prevent the Richards from acting in derogation of the interests of Intervenor–Appellant, the court held that an economic interest had passed under the trust to a family member, namely the son, because he had acquired the right, as the beneficiary of a passive trust, to have the trust terminated upon his demand and to have the legal title of the Residence transferred to him. Moreover, since the Richards held title to the Residence as trustees for Intervenor–Appellant, the court found that they were legally required to administer the property in his interest. However, because there was a dispute in the record as to whether the Richards had acknowledged to third-parties (that is, Malverne) that the Residence was the property of the trust, the court was unable to determine whether there was evidence that the Richards' relationship to the Residence was substantially the same before and after they created the trust. Nonetheless, the court concluded that the passing of an economic interest and the legal restrictions on the Richards as co-trustees were sufficient to defeat the IRS' sham trust theory.

Finally, the court found several disputed issues of material fact warranting a rejection of the IRS' contention that the trust is the nominee or alter ego of the Richards. *See In re Richards,* 1998 WL 205915, at *12–13. Using a test promulgated in *United States v. Klimek,* 952 F.Supp. 1100, 1113 (E.D.Pa. 1997), the court determined that undisputed evidence in the record established that little or no consideration was paid for the transfer of the Residence, and that the relationship between the relevant parties (the Richards and their son) could be characterized as a close one. However, the issues in dispute included whether the Richards represented themselves to third-parties (including Malverne) as owners of the property; whether the Richards' state of mind with respect to their ownership of the property changed after the creation of the trust; and what the purpose and intent of the Richards was in establishing the trust.

Unable to resolve the factual disputes relating to the IRS' nominee/alter ego theory, the court directed the parties to a trial on the merits, which was subsequently held on July 10 and 17, 1998. The Bankruptcy Court then issued another Memorandum Opinion in which it made the legal determinations that are the subject of this appeal. *See In re*

*Richards,* No. 97–14798DWS, 1998 WL 549001 (Bankr.E.D.Pa. Aug. 18, 1998). Preliminarily, the court held that, irrespective of whether title to the Residence was held in trust for Intervenor–Appellant or title to the Residence had vested in him in 1984, the nominee/alter ego theory remained available to the IRS in determining whether the Residence would be construed, for federal tax purposes, as belonging to the Richards if they indeed treated and viewed the property as their own. *See id.* at *6–7.

Then, after consideration of the *Klimek* factors, to the delineation of which none of the parties objected, the court concluded that the trust held the Residence as the Richards' nominee. *See id.* at *8–10. Accordingly, the court, while not reaching the issue of whether the trust was the Richards' alter ego, held that the IRS' claim was secured by the Residence and set a hearing to determine the value of the Residence. This value was recently determined by the court. *See In re Richards,* No. 97–14798DWS, 1999 WL 14680 (Bankr.E.D.Pa. Jan. 12, 1999).

## IV. DISCUSSION

### A. *Standards of Review*

In reviewing a bankruptcy court's determinations, the district court reviews its legal conclusions *de novo,* its factual findings for clear error, and its exercise of discretion for abuse thereof. *See In re Trans World Airlines, Inc.,* 145 F.3d 124, 131 (3d Cir. 1998). Due regard should also be given to the opportunity of the bankruptcy court to judge the credibility of witnesses. *See* Fed. R.Bankr.P. 8013. Although Intervenor–Appellant states that he is only challenging the Bankruptcy Court's legal conclusions and not its factual findings, *see* Intervenor–Appellant's Br. at 3, it is obvious that the determinations at issue here involve mixed findings of both law and fact. In that case, the findings must be separated by the reviewing court, with appropriate standards applied to each component. *See In re Fegeley,* 118 F.3d 979, 982 (3d Cir.1997). "On an appeal, the district court may . . . affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed.R.Bankr.P. 8013.

On appeal, Intervenor–Appellant advances three principal arguments. First, that the Bankruptcy Court erroneously relied on the nominee theory in light of its previous findings that the trust was not created for an improper purpose; that the trust was a passive one; that the transfer of the Residence was not a fraudulent conveyance; and that the trust was not a sham. Second, that the Bankruptcy Court erroneously misapplied the nominee theory to the facts in this case. And third, that the Bankruptcy Court improperly applied the nominee theory in the case *sub judice* to deprive Intervenor–Appellant of his interest because his parents made certain mistakes with respect to the trust after the transfer.

### B. *Reliance on the Nominee Theory*

The Bankruptcy Court properly relied on the IRS' nominee theory even after making various rulings regarding the legal status of the trust when it was first established. It is well settled that the IRS may properly levy against property of a delinquent taxpayer's nominee. *See, e.g., Today's Child Learning Ctr., Inc. v. United States,* No. CIV. A. 97–1063, 1998 WL 98990, at *6 (E.D.Pa. Mar. 6, 1998) (Newcomer, J.); *United States v. Klimek,* 952 F.Supp. 1100, 1113 (E.D.Pa.1997) (Dalzell, J.); *Ross Controls, Inc. v. United States,* 164 B.R. 721, 727 (E.D.Pa.1994) (Brody, J.). As is apparent from a reading of the cases applying this doctrine, the nominee theory stems from equitable principles. Focusing on the relationship between the taxpayer and the property, the theory attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner. Said another way, the nominee theory is utilized to determine whether property should be construed as belonging to the taxpayer if he/she treated and viewed the property as his/her own, in spite of the legal machinations employed to distinguish legal title to the property.

Intervenor–Appellant's arguments fail to appreciate the distinction between the legal status of the property placed in the trust at the time the trust was established, and the subsequent treatment of the property by the grantors. The Bankruptcy Court did indeed hold that the Richards had legally created a valid, passive trust and that the trust had been established for a proper purpose; that the transfer of the Residence had not been a fraudulent conveyance in order to avoid tax liabilities; and that the trust had not been a sham. At its core, all of these conclusions essentially address the validity of the trust at the time it was created and its continued viability as a separate legal entity. The nominee theory, by contrast, addresses the manner in which the Richards viewed and treated the property thereafter and thus, the mere existence of a separate legal entity has no bearing on its application after the time the trust was created. Accordingly, the Court holds that the Bankruptcy Court properly relied on the nominee theory.

C. *Application of the Nominee Theory*

The Bankruptcy Court properly applied the nominee theory to the facts in this case. While courts have identified a variety of factors relevant to the determination that property is, in fact, being held as the nominee of the taxpayer, the articulation employed by the Bankruptcy Court, taken in part from *United States v. Klimek,* comports with the current understanding of the nominee theory:

(a) No consideration or inadequate consideration paid by the nominee;

(b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;

(c) Close relationship between transferor and the nominee;

(d) Failure to record conveyance;

(e) Retention of possession by the transferor;

(f) Continued enjoyment by the transferor of benefits of the transferred property; and

(g) Expenditure of personal funds by the transferor to purchase and maintain the property.

However, these factors should not be applied rigidly or mechanically, as no one factor is determinative. Rather, the critical consideration is whether the taxpayer exercised active or substantial control over the property. *See, e.g., United States v. Kudasik,* 21 F.Supp.2d 501, 508 (W.D.Pa.1998).

The only factor that is clearly absent is (d), as it is undisputed that the Richards properly recorded the deed in Chester County, evidencing the transfer of the property to the trust. However, the record is equally clear that $1.00 for the transfer amounts to little or no consideration, and that the relationship of parents to their children is a close one. While Intervenor–Appellant would prefer wholly to disregard these two factors because this situation involved a transfer of a gift between family members, the Court will instead simply accord them relatively little weight under these facts.

The remaining factors are not so summarily disposed and require a careful review of the record. The Bankruptcy Court's prior ruling that the transfer was not a fraudulent conveyance essentially precludes any contention that the Richards transferred the property in order to avoid any then current debt to the IRS. Moreover, there is no evidence that the Richards transferred the property for the purpose of avoiding any future liability to the IRS. Other evidence in the record does suggest, however, that the Richards established the trust to protect the home generally from future creditors. In light of their own foreclosure experience after Husband's restaurant business failed, this is foresightful estate planning.

There is also substantial evidence in the record establishing that the Richards retained possession of the Residence, that they continued to enjoy all the benefits of owning the Residence, and expended their personal funds to maintain the property. Although the Richards occupied the Residence as their sole living quarters after the transfer, they never paid any rent to the trust for this privilege. As the occupants of the Residence, they were obliged to pay the living

expenses of the home, such as the utility bills for the telephone, electricity, and heating. All of these expenses were naturally paid using the Richards' personal funds. But significantly, the Richards, and not the trust, also paid the mortgage, real estate taxes, and homeowner's insurance premiums on the property—all with personal funds. Indeed, the Richards, and not the trust, were the named insureds on the insurance policy. Moreover, the Richards took ample advantage of the available federal income tax deductions for the payment of home mortgage interest and real estate taxes on their personal income tax returns, while concurrently failing to secure a taxpayer identification number for the trust, establish a separate trust bank account, file tax returns on behalf of the trust, file fiduciary tax returns on behalf of themselves, or even a gift tax return reflecting the initial transfer.

Furthermore, the Richards' representations to third-parties evince the manner in which the Richards treated and viewed the property. To Malverne, they identified themselves in their individual capacity as the owners of the Residence and thereby, granted a second mortgage on the Residence in exchange for a loan on which they personally obligated themselves. To the Pennsylvania Housing Finance Agency, they listed the Residence as one of their assets. In both cases, they utterly failed to disclose the very existence of a trust in connection with the Residence.

Intervenor–Appellant claims that, because he was only five years old, the Richards were obligated as co-trustees, as well as being his legal guardians, to act in a manner outwardly conforming with ownership. Evidence was presented at trial concerning the Richards' state of mind. To wit, the Richards testified that they told other third-parties that the home had been placed in trust for their son, and that they involved their son in certain home improvement decisions. In addition, in settling the foreclosure proceedings instituted by GMAC and Malverne, the Richards proceeded solely in their capacity as mortgagors, and not as co-trustees.

Considering all the evidence in the record, this Court concludes that the Richards owned the Residence in equity. Once having embarked upon a strategy to place the home in trust for their son, it was the Richards' obligation to maintain the formalities accompanying the establishment of a separate legal entity and to carry out their duties as co-trustees. Indeed, Mr. Richards, at least, was an experienced real estate broker, sophisticated enough to consider placing the Residence in a trust, to seek legal advice to accomplish this, and to make clear that the trust owned the Residence when applying for the home equity loans. Similar precautionary steps ought to have been taken after the transfer. The Richards' unequivocal actions here speak louder than their assertions and are consistent with a determination that the Richards viewed and treated the home as their own. That is, the Richards' relationship to the Residence was substantially the same before and after they established the trust in that they exercised active or substantial control over the property. Accordingly, this Court holds that the Bankruptcy Court properly determined that the trust held the Residence as the Richards' nominee.

D. *Intervenor–Appellant's Equity Argument*

Ironically, Intervenor–Appellants also claims that it would be inequitable to hold him responsible for the Richards' omissions and liabilities once title to the Residence had vested in him. The Court is not persuaded.

First, Intervenor–Appellant's arguments in this regard were not raised by him in the Bankruptcy Court and are being maintained for the first time on appeal. Thus, this Court need not address them as he has waived them for purposes of this appeal. *See In re Sacred Heart Hosp. of Norristown*, 133 F.3d 237, 241 n. 6 (3d Cir.1998). Second, even if they were to be considered, the Court finds not only factual assertions unsupported by the record, but also contentions of illogic and excusable mistake which lack merit. As the trust's beneficiary, it appears that Intervenor–Appellant will be harmed should the IRS foreclose on the Residence. However, this is a result which may occur in intra-

family transfers where little heed is paid to legal formalities.

### V. CONCLUSION

For the foregoing reasons, the order of the Bankruptcy Court for the Eastern District of Pennsylvania dated August 18, 1998 is AFFIRMED.