**BAUM HYDRAULICS CORPORATION, f/k/a BAUM CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 4:01CV454.

United States District Court, D. Nebraska.

Sept. 8, 2003.

Larry E. Welch, Jr., Welch Law Firm, Omaha, Plaintiff's Counsel.

Martin M. Schoemaker, U.S. Department of Justice, Tax Division, Washington, D.C., Defense Counsel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

This is an action brought pursuant to 28 U.S.C. § 2410 to determine whether the Internal Revenue Service ("IRS") has issued a valid lien against plaintiff Baum Hydraulics Corporation ("Baum–Nebraska"[1]). Following a bench trial on the merits of this case, I now issue my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[2]

### I. FINDINGS OF FACT

In May 1991, the IRS began an examination regarding unpaid estate taxes and estate income tax liabilities relating to Sloan Allen, who died on March 8, 1987.[3] The IRS's examination resulted in personal tax assessments in the amount of $26,009,568.99 against Sloan Allen's son, David Allen, on the theory that David Allen was the fiduciary and transferee of his father's estate, but he failed to pay estate taxes and estate income taxes relating to his father's assets.

Because the IRS was unable to satisfy the full personal tax assessment against David Allen, the IRS filed a lien against plaintiff Baum–Nebraska on July 5, 2001,[4] claiming that Baum–Nebraska is the nominee or alter ego of David Allen and, therefore, the IRS should be able to pierce Baum–Nebraska's corporate veil and satisfy David Allen's personal obligation with Baum–Nebraska's assets.[5] (Trial Ex. 50.)

### A. Baum–Nebraska and Christiania Corporation

Plaintiff Baum–Nebraska was incorporated in Nebraska in 1906 under the name The Omaha Iron Store Company. At that time, it acquired the business of The Baum Iron Company, which itself began operations in 1857 and was incorporated on August 16, 1888. From 1916 to 2000, the company amended its articles and changed its name five times, the most recent being April 3, 2000, when the company changed its name to Baum Hydraulics Corporation after an asset sale.

Baum–Nebraska's business—located in downtown Omaha for over 100 years—primarily involved retail sales of precision machinery components utilized for farm, construction, mining, off-road vehicles, and industrial and factory equipment. As of February 2000, Baum–Nebraska had over 1,000 customers across the country and employed approximately 60 people. Of its average yearly gross revenues of between $7,000,000 and $8,000,000, Baum–Nebraska generated only $21,278 in gross receipts outside the United States in Canada, Puer-

---

1. "Baum–Nebraska" was the name commonly used by the parties at trial to distinguish the plaintiff from other related entities.

2. Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law more properly deemed a finding of fact, should be so construed.

3. Unless otherwise indicated, the facts recited in this section are established by the parties' Stipulation of Facts attached to the Order on Pretrial Conference (filing 39).

4. On July 31, 2001, plaintiff Baum–Nebraska attempted to appeal the claim of lien against

it by filing Form 12153, Request for a Collection Due Process Hearing, in accordance 26 U.S.C. § 6320. (Trial Ex. 51.) On August 6, 2001, the IRS returned Baum–Nebraska's filing, claiming that Baum–Nebraska was not entitled to a due process hearing since Baum–Nebraska is the alleged alter ego of David Allen, and David Allen had previously had a due process hearing. (Trial Ex. 52.)

5. Sloan Allen did not own any shares or interest in plaintiff Baum–Nebraska at the time of his death.

to Rico, Bolivia, Trinidad, and Honduras since 1994. (Filing 18, Answer to Interrogatory No. 9 & Ex. C; Trial Ex. 71; Trial Tr. at 76.)

Baum–Nebraska had various shareholders since its incorporation in 1906. As of 1977, David Allen was the sole shareholder with 1,184 shares of stock. Beginning in 1993, Baum–Nebraska issued 117,216 shares of stock to Christiania [6] Corporation, which was incorporated in 1993 in Vaduz, Liechtenstein. Also in 1993, Christiania Corporation issued a proxy agreement authorizing David Allen to vote all its shares in Baum–Nebraska. On September 1, 1994, David Allen gifted his 1,184 shares of stock in Baum–Nebraska to Christiania Corporation, making Christiania the sole shareholder of Baum–Nebraska.[7]

Although Christiania Corporation owned Baum–Nebraska at that point, David Allen's key employees at Baum–Nebraska did not know who owned Christiania, nor did they know the names of any principals or other contacts at Christiania. David Allen indicated to his employees that communication with Christiania should go through him and he would "take care of it." (Depo. Beverly A. Randall at 38–39; Depo. Gordon Gilbertson at 29–34.) Because of a proxy agreement between Christiania Corporation and Baum–Nebraska, David Allen controls all the shares of Christiania. (Trial Ex. 21.) Christiania Corporation has never filed a federal tax return, and the Internal Revenue Service does not have a federal identification number for Christiania. (Trial Tr. 158.)

### B. Baum–Delaware and Hydraulics Baum, S.A.

On February 8, 2000, David Allen incorporated a new Baum Hydraulics Corporation in the state of Delaware ("Baum–Delaware"). (Trial Ex. 63.) The new corporation's shareholders were certain longtime former employees of Baum–Nebraska. On February 22, 2000, Baum–Nebraska sold its assets to Baum–Delaware in exchange for a promissory note in the amount of $550,000,[8] and Baum–Delaware began operating its business on that date. (Trial Ex. 38.) Immediately upon the asset sale, and at David Allen's request, the Baum–Delaware employee-owners issued voting trusts in favor of David Allen which gave Allen voting rights with respect to the employee-owners' shares. (Depo. Beverly A. Randall at 37–38 & 108.) Those voting trusts were revoked on April 1, 2002, leaving 100 percent ownership and control of Baum–Delaware with the employee-owners. (Trial Ex. 57.) David Allen was no longer affiliated with Baum–Delaware after his March 26, 2002, resignation.[9] (Depo. Beverly A. Randall at 36.)

Baum–Delaware made monthly payments [10] on the $550,000 note from January 2001 to August 2002 to an account entitled "Baum Hydraulics Nebraska" in

---

6. The name of this corporation appears as both "Christiana" and "Christiania" in the record. I will use the spelling appearing in Christiania Corporation's incorporation documents. (Trial Ex. 18.)

7. David Allen filed a gift tax return with the Internal Revenue Service documenting this transfer.

8. The purchase price was supported by an independent audit conducted by the accounting firm of Boyle, Hess & Elliott, an Omaha accounting firm. The defendant has conceded that for purposes of this litigation, the asset sale was a legitimate transaction. (Trial Tr. at 49.)

9. The shareholders of Baum–Delaware elected to maintain David Allen's group medical insurance despite his retirement. (Depo. Beverly A. Randall at 98–99.)

10. These monthly payments were in the amount of $3,883.03. (Trial Tr. 121.)

Switzerland.[11] Because David Allen did not open this Swiss account until October 2001, Baum–Delaware kept the January 2001 to September 2001 checks in its vault pursuant to David Allen's direction, after which it mailed them to Allen for placement in the newly-opened Baum–Nebraska bank account in Switzerland. After October 2001, Baum–Delaware wired the monthly payments to the Baum–Nebraska account in Switzerland. (Trial Tr. 120–123, 127–128.) After August 2002, Baum–Delaware has applied what would have been payments on the note against a receivable that David Allen owed Baum–Delaware for various expenses that Allen incurred and Baum–Delaware funded. (Depo. Beverly A. Randall at 50; Trial Tr. 93–99, 102–104, 124–126.)

Hydraulics Baum, S.A., was incorporated in 1988 in Switzerland, where it also maintains its business office. Hydraulics Baum, S.A., entered into an Agency Agreement, Consulting Agreement, and Management Agreement with Baum–Nebraska between 1988 and 1990. The Agency Agreement stated that Hydraulics Baum, S.A., would "perform all the services and functions required ... for the furtherance and establishment of Baum Iron Company's presence in Greater Europe ...." Under the Consulting Agreement, "David S. Allen [was to] provide consulting and management and other services to Hydraulics Baum, S.A. and through Hydraulics Baum, S.A. provide consulting, management, and agency services to Baum Iron Company, (A Nebraska Corporation)." The Management Agreement provided that Hydraulics Baum, S.A., would "perform all the management systems and management services and functions required or needed by Baum Iron Company or its successor corporations." (Depo. Beverly A. Randall, Ex. 29; Trial Exs. 30–36.)

David Allen, who moved to Switzerland in the early 1990s, is the president, chairman, and direct and general manager of Hydraulics Baum, S.A., and is employed as a consultant for that business, although Allen is and was "not set up on the payroll to get a paycheck per se" for those consulting services. (Depo. Debra M. Carlberg at 43; Depo. Beverly A. Randall at 45 (David Allen "has never drawn a salary.").)

Compensation from Baum–Nebraska was the only source of revenue for Hydraulics Baum, S.A. At David Allen's request, Baum–Nebraska made monthly payments by wire transfer from its business bank account to the business bank account of Hydraulics Baum, S.A., in Switzerland, which David Allen controlled.[12] Baum–Nebraska paid $1,254,798.45 to Hydraulics Baum, S.A., from 1993 to 2001: $75,000.00 in 1993; $74,999.99 in 1994; $170,312.00 in 1995; $119,802.28 in 1996; $170,861.00 in 1997, $104,540.00 in 1998, $277,610.23 in 1999, $228,677.07 in 2000, and $32,995.88 as of April 30, 2001. (Trial Exs. 1(B), 26, 68; Filing 18, Answer to Interrogatory No. 11 & Ex. D; Depo. Debra M. Carlberg at 23; Depo. Gordon Gilbertson at 55.) Baum–Nebraska also paid certain of Allen's credit card bills and business checks, some of which the IRS asserts were personal in nature. The controller of Baum–Nebraska (and later Baum–Delaware) does not have "any idea what Hydraulics Baum S.A. was doing for ... Baum Iron to merit those payments." (Depo. Beverly A. Randall at 9 & 124.)

While overseas, Allen attempted to establish an "international presence in terms

---

**11.** Neither Plaintiff's nor Defendant's counsel knew of the Baum–Nebraska account in Switzerland until the day of trial. (Trial Tr. 198 & 237.)

**12.** The Hydraulics Baum, S.A., account in Switzerland is separate from the Swiss account that holds payments on the $550,000 note. (Trial Tr. at 95.)

of sales and increasing its revenue, opening up new markets." However, "[n]othing came to fruition, and so that's the end result, was zero ... gain." (Depo. Gordon Gilbertson at 46 (company often shipped sales catalogs to Allen in Switzerland) & 107; Trial Ex. 46 (foreign business contacts).) Gordon Gilbertson, Baum–Nebraska's chief operating officer in 1993 and president from 1993–1998, testified that he and David Allen disagreed on the use of money within the Baum–Nebraska company. The two men "got into a real battle" when Gilbertson put $100,000 toward a $1,000,000 bank loan of the company and Allen wanted the money sent to Switzerland instead. To remedy the situation, Allen "went and borrowed the money back." (Depo. Gordon Gilbertson at 32 & 62; Depo. Beverly A. Randall at 86–87; Trial Ex. 98.)

Gilbertson thought the money being sent to Switzerland was being used to pay Allen's day-to-day living expenses because the company "didn't buy anything out of the Swiss account for the assets of the company ... for the Baum Iron assets." (Depo. Gordon Gilbertson at 57.) The financial manager of Baum–Nebraska from 1996 to 1998 did not know the reason for the monthly wire transfers to Switzerland, but the manager "was told that it was [David Allen's] commissions for all these sales that he was supposed to be getting for the company." (Depo. Debra Carlberg at 7 & 25.)

Although Allen lived in Switzerland, he called his Baum–Nebraska—and later Baum–Delaware—employees frequently and for hours at a time to monitor the status of the businesses.

## C. Allen's Residence

David Allen was born and raised in Omaha, Nebraska. His family's personal residence was located at 3722 Dewey Avenue and has been owned by the family and, ultimately David Allen, since 1932. In the early 1990s, David Allen moved his personal residence from Omaha to a Switzerland apartment. When he moved, he took with him furniture and other contents from his Dewey Avenue home, and in 1994 transferred the house to Christiania Corporation. Baum–Nebraska has since used the 3722 Dewey Avenue house for limited business-record storage and as a residence for the Allen family's long-time Omaha housekeeper and corporate secretary, Chastene Smyser.[13] Since 1997, Baum–Nebraska has paid real estate taxes, telephone bills, insurance costs, and several interior and exterior repair expenses on the Dewey Avenue residence. (Trial Ex. 1(C).)

The house was transferred along with Baum–Nebraska's company assets to Baum–Delaware in February, 2000, in consideration for a $200,000 note. Baum–Delaware sold the property for a $200,000 note to Chastene Smyser, who subsequently transferred the house back to Baum–Delaware. The IRS has since seized the house and sold it to satisfy tax liabilities of David Allen.

## D. Timeline

A timeline summarizing the above events appears below:

1988            Hydraulics Baum, S.A., incorporated in Switzerland.

---

13. Baum–Nebraska paid Chastene Smyser $19,458.00 annually for her combined business services.

| | |
|---|---|
| Early 1990s | David Allen moves to Switzerland. |
| May 1991 | IRS begins examination regarding unpaid estate taxes and estate income tax liabilities relating to the deceased Sloan Allen, David Allen's father. |
| 1993 | Baum–Nebraska pays $1.2 million to Hydraulics Baum, S.A., from 1993–2001, as well as some of David Allen's credit card bills and business checks. |
| Sept. 1, 1994 | Christiania becomes sole shareholder of Baum–Nebraska. |
| Feb. 8, 2000 | Allen incorporates Baum–Delaware. |
| Feb. 22, 2000 | Baum–Nebraska sells assets to Baum–Delaware in exchange for $550,000 promissory note. Allen gets voting trusts from all shareholders. |
| Jan.2001–July 2001 | Baum–Delaware makes $3,883.03 monthly payments to Baum–Nebraska on the $550,000 note. Checks kept in Baum's Omaha vault at David Allen's instructions. |
| July 5, 2001 | IRS places lien on Baum–Nebraska. |
| July 2001–Sept. 2001 | Baum–Delaware continues to make $3,883.03 monthly payments to Baum–Nebraska on the $550,000 note. Checks kept in Baum's Omaha vault at David Allen's instructions. |
| Oct. 2001 | Swiss account called "Baum Hydraulics Nebraska" opened. |
| Mar. 26, 2002 | David Allen resigns. |
| Apr. 1, 2002 | Baum–Delaware voting trusts in favor of David Allen revoked, leaving 100 percent ownership and control of Baum–Delaware with employees. |
| Aug. 2002 | Baum–Delaware stops payments on note, instead applying payments against a receivable David Allen owed Baum–Delaware for expenses incurred by Allen and funded by Baum–Delaware. |

## II. CONCLUSIONS OF LAW

Title 26, section 6321, of the United States Code provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." The language of this statute is "broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. National Bank of Commerce*, 472 U.S. 713, 719–20, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985). " 'Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes.' " *Id.* (quoting *Glass City Bank v. United States*, 326 U.S. 265, 267, 66 S.Ct. 108, 90 L.Ed. 56 (1945)).

■ The government can collect tax debts from the assets of a taxpayer's nominee, instrumentality, or alter ego. *United States v. Scherping*, 187 F.3d 796, 801 (8th Cir.1999), *cert. denied*, 528 U.S. 1162, 120 S.Ct. 1175, 145 L.Ed.2d 1084 (2000). Taxpayers are allowed to reduce their tax burden by any lawful means available, but

they may not "construct paper entities to avoid taxation when those entities are without economic substance." *Id.* (internal quotation marks and citation omitted).

### A. Alter Ego Theory

The United States first claims that its federal tax lien against Baum–Nebraska is valid because Baum–Nebraska is the alter ego of David Allen. "When an entity is without economic substance, it may be deemed to be the 'alter ego' of the taxpayer. Alter ego means other self—where one person or entity acts like, or, for another to the extent that they may be considered identical." *Id.* (internal quotation marks and citation omitted). Federal courts generally look to state law to determine whether an entity is an alter ego of a taxpayer. *Id.; Loving Saviour Church v. United States,* 728 F.2d 1085, 1086 (8th Cir.1984).

Under Nebraska law, the factors relevant in determining whether a corporation is, or becomes, an alter ego of a person such that the corporate form should be disregarded, include:

> diversion by the shareholder or shareholders of corporate funds or assets to their own or improper uses and the fact that the corporation is a mere facade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.

*Medlock v. Medlock,* 263 Neb. 666, 677, 642 N.W.2d 113, 124 (2002). Other factors include "the absence of corporate formalities, the commingling of corporate and personal funds and expenses, and the family relationship between corporate officers and the taxpayer." *Horton Dairy, Inc. v. United States,* 986 F.2d 286, 289 (8th Cir. 1993).

As opposed to cases in which creditors are seeking to "pierce the corporate veil" and hold individual shareholders liable for corporate debts, the case now before me involves "reverse piercing," which, under Nebraska law, is when assets of a corporate entity—Baum-Nebraska—are sought to satisfy the obligations of a controlling alter ego—David Allen. *Medlock,* 263 Neb. at 677, 642 N.W.2d at 124; *Scherping,* 187 F.3d 796, 803 ("reverse piercing is a well-established theory in the federal tax realm").

### B. Nominee Theory

The United States also argues that the federal tax lien filed against Baum–Nebraska is valid because Baum–Nebraska holds property—the $550,000 promissory note—as the nominee of the taxpayer, David Allen. "A legitimate corporation may, of course, hold a particular asset for an individual as a nominee." *LiButti v. United States,* 107 F.3d 110, 119 (2nd Cir. 1997). Being unable to locate a clear definition or application of the nominee theory in Nebraska or in the Eighth Circuit Court of Appeals, I must consult case law from other jurisdictions.

> [T]he nominee theory stems from equitable principles. Focusing on the relationship between the taxpayer and the property, the theory attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner. Said another way, the nominee theory is utilized to determine whether property should be construed as belonging to the taxpayer if he/she treated and viewed the property as his/her own, in spite of the legal machinations employed to distinguish legal title to the property.

*Richards v. United States,* 231 B.R. 571, 578 (E.D.Pa.1999). Much like the alter ego analysis discussed above, the critical factor

in determining whether a nominee situation exists is "whether the taxpayer exercised active or substantial control over the property." *Id.* at 579.[14] Perhaps because of the similar inquiry involved in the alter ego and nominee analyses, courts have blurred the two concepts. *United States v. Taylor,* 2001 WL 1636505, at *6 (D.Minn. Oct.24, 2001) (referring to the "nominee/alter ego doctrine" and "alter ego/nominee theory"); *United States v. Klimek,* 952 F.Supp. 1100, 1113–14 (E.D.Pa.1997) (concluding that certain entities were "nominees and alter egos" of defendant without separate analysis of each theory). As aptly stated by one court:

> This court's review of the case law and secondary authorities elicits no significant practical differences between the terms "nominee" and "alter ego." Focusing on the relationship between the taxpayer and the property, the nominee theory [asks whether a taxpayer has placed legal title to property in the hands of another while retaining all or some of the benefits of being the true owner]. An alter ego theory focuses more on those facts associated with a "piercing the corporate veil" analysis.... [T]he relevant inquiry under Iowa law is a flexible one which encompasses aspects from both the traditional alter ego and nominee analyses.... [T]he analysis and conclusions herein hold equally regardless of the term applied.

*United States v. Engels,* 2001 WL 1346652, at *6 (N.D.Iowa Sept.24, 2001) (internal citations omitted) (finding trusts to be alter egos and nominees of individual taxpayers because taxpayers exercised "unbridled control" over trust assets, failed to distinguish between trust and personal expenses and funds, and used trust assets as if they were their own), *amended on other grounds,* 2001 WL 1782887 (N.D.Iowa Oct.24, 2001).

Thus, insofar as the alter ego/nominee characterization is concerned, "we must avoid an over-rigid preoccupation with questions of structure and apply the preexisting and overarching principle that liability is imposed to reach an equitable result." *LiButti,* 107 F.3d at 119 (internal quotation marks and citations omitted).

### C. Baum–Nebraska and David Allen

The evidence in this case establishes that for each of the six months preceding July 5, 2001—the date the IRS placed its tax lien on Baum–Nebraska "as Nominee and/or Alter Ego of David Allen" (Trial Ex. 50)—David Allen had been instructing his Baum–Delaware employees to hold in the company's Omaha, Nebraska, vault its $3,883.03 monthly payments to Baum–Nebraska on the $550,000 promissory note. Allen specifically told Baum–Delaware's controller to keep the checks in the vault until he opened an account in Switzerland. (Trial Tr. 122 & 128.) Once Allen opened the Swiss account in October 2001, the checks that were being held in the vault were mailed to Allen at his personal apartment address in Switzerland and Baum–Delaware's subsequent monthly payments were wired directly to the account. Allen did not explain to Baum–Delaware's con-

---

**14.** Other factors include (1) no consideration or inadequate consideration paid by the nominee; (2) property placed in the name of the nominee in anticipation of a lawsuit or liability while the transferor continues to exercise control over the property; (3) the transferor and nominee share a close relationship; (4) failure to record the conveyance; (5) transferor retains possession; (6) transferor continues to enjoy the benefits of the transferred property; and (7) transferor uses personal funds to purchase and maintain the property. *Richards,* 231 B.R. at 579. According to the *Richards* court, these factors are not to be applied rigidly or mechanically, and no one factor is dispositive. *Id.*

troller (who had been with the company since 1999) why he chose to open Baum–Nebraska's bank account in Switzerland instead of opening a bank account in Nebraska, as the company had done for decades. (Trial Tr. 122–28.)

Also during this time, David Allen and his former housekeeper, Chastene Smyser, became the only directors of Baum–Nebraska and Baum–Delaware. (Trial Ex. 6 (showing Allen and Smyser as the president, treasurer, secretary, assistant secretary, and records management officer for Baum–Nebraska as of September 24, 2001, and for Baum–Delaware from March 2000 to March 2002).)

It is apparent that after Baum–Nebraska sold its assets to Baum–Delaware in February 2000, Baum–Nebraska's sole purpose became collecting the promissory note payments from Baum–Delaware.[15] Even assuming the asset sale was lawful and Baum–Nebraska's limited business purpose is legitimate, it is clear that David Allen began deviating from corporate formalities while exercising active and substantial control over the promissory note payments in January 2001 when Allen instructed his Baum–Delaware employees to hold its promissory note payments in Baum–Delaware's vault until he could get a Swiss bank account set up for Baum–Nebraska. Further, when the Swiss bank account was opened in October 2001 and the promissory note payments that had been accumulating in Baum–Delaware's vault were deposited therein, Allen openly abused Baum–Nebraska's corporate form for his own purpose—that is, to avoid personal tax liability by placing the asset sale proceeds beyond the reach of the IRS,

which had placed a lien on Baum–Nebraska "as Nominee and/or Alter Ego of David Allen" on July 5, 2001.

■ Recognizing that Allen's operation of Baum–Nebraska following the asset sale shares aspects of both the alter-ego and nominee theories, and seeking to "avoid an over-rigid preoccupation with questions of structure," *LiButti*, 107 F.3d at 119, I conclude that Baum–Nebraska holds title to its property (the $550,000 promissory note and payments made thereon (Trial Ex. 39))[16] as the alter ego or nominee of David Allen and the federal tax lien (Trial Ex. 50) filed on July 5, 2001, attaches to such property.

Accordingly,

IT IS ORDERED that Plaintiff, as it existed following its February 2000 asset sale to Baum Hydraulics Corporation, a Delaware corporation, holds title to its property (the $550,000 promissory note and payments made thereon) as the alter ego or nominee of David Allen, Transferee of the Estate of Sloan Allen, Deceased, Transferor, and the federal tax lien filed against Plaintiff on July 5, 2001, attaches to such property.

---

15. "[F]ollowing the sale, the only tangible asset of Baum–Nebraska was the promissory note and the only business purpose remaining was to collect on that note." (Pl.'s Closing Br. at 9.) Because the legality of the asset sale is not an issue before this court, I make no conclusion regarding the propriety of the sale.

16. The record in this case does not indicate that Baum–Nebraska had any other assets on the date the federal tax lien against it was filed.