**J.L. SUMPTER and Shaundra Sumpter, Plaintiffs and Counter-defendants,**

v.

**UNITED STATES of America, Defendant and Counter-plaintiff.**

No. 01–10214–BC.

United States District Court, E.D. Michigan, Northern Division.

Feb. 5, 2004.

Joseph Falcone, Joseph Falcone Assoc., Southfield, MI, for plaintiff/counter-defendant.

Michael W. Davis, Washington, DC, for defendant/counter-claimant.

## OPINION

LAWSON, District Judge.

Jerry Sumpter was an author and attorney practicing law in Northern Michigan who incurred a liability for unpaid federal income taxes beginning with the 1981 tax year. The government now claims that Sumpter, whose present whereabouts are unknown, owes the government over $500,000. The plaintiffs in this case are the adult children of Jerry and Santina Sumpter and are beneficiaries of a Trust that their parents created in 1979. From time to time, the Sumpters conveyed real estate to the Trust, which eventually passed on to their children when the children attained 18 years of age and the Trust was dissolved. The government filed liens against these properties based on the twin theories that the transfers of the property to the Trust constituted fraudulent conveyances and that the Trust was merely the nominee or alter ego for Jerry Sumpter. The plaintiffs have filed a complaint to quiet title seeking to extinguish these tax liens. The government counter-claimed and asserted the same two theories as the basis of its effort to foreclose the liens. The case came on for trial and the Court heard testimony from nine witnesses in open court and received 49 exhibits. The parties filed post-trial briefs and proposed findings. The following constitutes the Court's findings of fact under Fed.R.Civ.P. 52, followed by its application of the governing law.

### I.

On or about May 1, 1979, Jerry Sumpter and his wife, Santina, created an irrevocable trust in the name of their children called the J.L. & Shaundra Sumpter Trust ("the Trust"). The Trust document provided that the trustee was to have exclusive control over the Trust. *See* Joint Ex. 1. The Trust document also restricted the authority of the trustee to make loans to the settlors, Jerry and Santina Sumpter, but did not prevent loans to Jerry Sumpter's law practice. In fact, multiple loans were made to Sumpter & Perry, P.C. over the years amounting to several hundred thousand dollars. The loans were documented and always repaid.

Santina Sumpter, one of the settlors, acknowledged that she signed the Trust document with the understanding that the Trust was set up for the two children and that the Trust would be funded by rent from the real estate on which Jerry Sumpter's law office property was located. She testified that the Trust was "run" by Jerry Sumpter and the trustees. Santina's signature was witnessed by Judy Arnold and Mildred Fulmer, now Mildred Burris, both of whom testified that they were employed as legal secretaries in Jerry Sumpter's

office in 1979. Judy Arnold testified that she worked as a secretary in Sumpter's law office from 1975 through May 1979 and then again in 1983; and Burris testified that she worked for Sumpter from 1972 to 1982.

The Trust assets consisted primarily of several parcels of real estate that were conveyed to the Trust from time to time, and the accumulated rents that some of these properties generated. The real estate, described in more detail below, can be categorized into three groups. The first group was comprised of the office building at 11118 Straits Highway, Cheboygan, Michigan in which Jerry Sumpter conducted his law practice. Jerry Sumpter transferred this parcel to the Trust in 1979 pursuant to a schedule attached to the Trust agreement, but the paperwork was not recorded until after Jerry Sumpter began having his tax problems in 1986. The ownership of this property, defined by a metes-and-bounds description set forth in Count I, Paragraph 4 of the complaint (and in the Trust schedule, see Joint Ex. 1), was disputed, but that dispute was resolved in favor of the Trust and the plaintiffs here in a Judgment filed in the Cheboygan County Circuit Court on April 14, 1999. See Pls.' Ex A1 & A2.

The second group consists of six lots: two parcels in Inverness Township, Cheboygan County; three parcels in Benton Township, Cheboygan County; and one parcel in Bangor Township, Bay County. These lots were mortgaged to the Trust to secure a loan to Jerry and Santina Sumpter in the amount of $90,000 on January 11, 1988. The land was conveyed to the Trust to repay the loan and satisfy the mortgage on April 21, 1988. The property was owned equally by Jerry and Santina Sumpter before it was conveyed to the Trust.

The third group is made up of two lots: Lot 19, Beaugrand Estates, Cheboygan County (commonly known as 1444 Nicolet, Cheboygan, Michigan), purchased in the name of the Trust on July 31, 1990, and 10841 Moonlight Bay, Cheboygan, Michigan (which includes adjacent vacant lots 46, 47, and 48) conveyed via deed to the Trust on January 22, 1993. The Moonlight Bay property was purchased on a land contract by Jerry and Santina Sumpter on August 31, 1978, and their equitable interest was conveyed to the trust on April 21, 1988.

The tax delinquencies in this case first came to Jerry Sumpter's attention in 1986. In August of that year, the Internal Revenue Service (IRS) notified Jerry Sumpter that it proposed to assess additional income taxes against him for taxable years 1985 and 1986. The IRS also notified Jerry and Santina Sumpter that there was a delinquency on their 1984 income tax return (Form 1040), and on December 8, 1986 a representative from the Secretary of the Treasury made an assessment of $45,874.79. In 1987, the IRS notified Jerry Sumpter that it proposed to assess additional income taxes against him for taxable years 1981 and 1982, and on July 27, 1987 a decision was filed by the United States Tax Court establishing that Jerry Sumpter had an additional income tax deficiency for those years. On August 19, 1987, assessments were made in the amount of $222,131.30 for the 1981 return and $78,321.13 for the 1982 return.

In December 1987, Jerry Sumpter received a notice of tax delinquency from the IRS for the years in question. Sumpter did not pay the tax. However, two weeks after he received a notice of tax delinquency, Jerry Sumpter and Santina Sumpter borrowed $90,000 from the Trust, despite the prohibition against loaning money to the settlors. The money was used to pay debts incurred by Jerry Sumpter's law firm. As collateral for the loan from the

Trust, Jerry and Santina Sumpter gave the Trust a mortgage on the six parcels of real estate previously referenced. The legal descriptions of the properties as conveyed by the mortgages are as follows:

(a) Land in the Township of Inverness, County of Cheboygan, States of Michigan, described as follows:

Commencing at South 1/4 corner Section 6, thence South 86 degrees 2 minutes 40 seconds Est along South line 1,596.40 feet to Easterly right of way line of M–27; thence Northerly along arc of curve right-of-way line with chord bearing North 18 degrees 20 minutes West 113.80 feet to point of beginning; thence Northerly along arc of curved right-of-way line with chord bearing North 14 degrees 35 minutes 40 seconds West 168.75 feet; thence South 86 degrees 2 minutes 40 seconds East 305.78 feet; thence South 1 degree 37 minutes 40 seconds East 154.41 feet; thence North 87 degrees 23 minutes 30 seconds West 268.14 feet to point of beginning being part of Government lot 4, Section 6, Town 37 North, Range 1 West.

and

Par 1, West 332 Feet of West 1/4 of the Northwest 1/4, Section 9, Town 37 North, Range 2 West.

(b) Land in the Township of Benton, County of Cheboygan, State of Michigan, described as follows:

Commencing at the Southeast corner Section 3; thence West 330 feet; thence North 264 feet; thence East 330 feet; thence South 264 feet; to point of beginning; Section 3, Town 37 North, Range 1 West.

and

Commencing at intersection of South line, Government Lot 4 and East bank of Cheboygan River; thence North along bank 50 feet for point of beginning; thence East par to South line 150 feet more or less to road; thence North along road 100 feet; thence West 150 feet more or less to river bank; thence South along East bank of river 1200 feet to point of beginning, part of Government Lot 4, Section 8 Town 37 North, Range 1 West.

and

Lots 46, 47, 48, and 3/57 of Lot 58 of GLENN C. MOUNTJOY SUBDIVISION to the extent of vendee's equitable interest thereon.

(c) Land in the Township of Bangor, County of Bay, State of Michigan, described as follows:

Lots 15 and 16, Block 3, THE WEST LAWN PLATS.

Countercl. at ¶ 13.

On April 7, 1988, the IRS sent Jerry Sumpter a "Final Notice (Notice of Intent to Levy)" informing him that the IRS had sent notices to him to pay his unpaid federal tax liabilities for tax years 1981, 1982, and 1985 (1984 was not included), which at that time was $184,931.58, but that he had failed to do so. The IRS also informed him that it planned on taking collection action against him and his assets. IRS Revenue Officer Kenneth Neumann testified that he met with Jerry Sumpter on April 21, 1988 and told him that the IRS was about to commence collection proceedings against him, including the filing of a notice of a federal tax lien against his property. A final notice had been signed by Neumann on April 7, 1988 but no payment was made against the tax liability. Neumann did not file the tax liens immediately because Sumpter submitted an offer and compromise, which suspended all collection activities while a decision to accept or reject was pending.

Several hours after the meeting between Neumann and Sumpter on April 21, 1988, Jerry and Santina Sumpter transferred their interests in the six parcels of land to the Trust. In addition, on April 26, 1988

the Trust document was recorded with the Register of Deeds for Cheboygan County, Michigan for the first time. The attachment to the Trust document as recorded included a description of real estate commonly known as 11118 Straits Highway, Cheboygan, Michigan 49721, which was the office building in which Jerry Sumpter housed his law practice, showing that it had been conveyed to the Trust in 1979 when the Trust was created. The tenants had been paying rent to the Trust well before the Trust document was recorded. The IRS rejected Sumpter's offer and compromise, and notices of federal tax liens reflecting the tax liabilities previously summarized were filed with the Register of Deeds for Bay County and Cheboygan County, Michigan on May 3, 1988.

The Trust itself had three trustees during its existence, and although none of them had any formal affiliation with Jerry Sumpter or his law office, they allowed him to make most of the important decisions regarding the Trust assets and its operations. John Church was the first trustee. He testified that he is Jerry Sumpter's step-father, having married Sumpter's mother when Sumpter was twelve years old. Church knew that the purpose of the Trust was to put money aside for Jerry's and Santina's two children to fund their education. He said that Sumpter was not in financial trouble at the time, and he was not aware that Sumpter had any tax delinquencies. Church testified that he knew that the children were the beneficiaries of the Trust and that they would receive the Trust property when they reached eighteen years of age, but he also acknowledged that he had no prior experience as a trustee and he could not remember if he performed any of the duties of the trustee outlined in the Trust. Church stated that he did not collect Trust income, make investments, sell property, or allocate receipts or disbursements between principal and income. The Trust records were kept at Jerry Sumpter's law office, and although Church did look at the books from time to time, he stated that he did not have the education to know what he was looking for. Church owned and operated a party store from 1966 to 1982 and opened a sign shop business thereafter, but his wife did all of the bookkeeping. Church signed checks for the Trust prepared by Jerry Sumpter's secretary, and Church signed and filed income tax returns for the Trust each year. But Church agreed that Jerry Sumpter made all the important decisions for the Trust.

Church did not know that property had been transferred to the Trust, although he did know that Sumpter's law office building was Trust property and that trust income came from office rent. He did not know if there was a written lease or who handled the insurance or maintenance on the office building. Church knew that Jerry Sumpter borrowed money from the Trust, but he always discussed these loans first with Church (who signed the checks), and he always paid back the money.

Jerry Sumpter's mother (Church's wife) died on April 7, 1986. Church remained as trustee until December of that year, and then resigned of his own accord because of a disagreement with Jerry Sumpter over the payment of Church's wife's funeral expenses.

The next trustee was Betty DeGroff. Her signature appears on the mortgage discharges given by the Trust on April 23, 1988 in exchange for the conveyance of the Sumpters' interest in the six lots that extinguished the $90,000 loan. Ms. DeGroff served a short time until her death in the latter 1980s.

Following Ms. DeGroff's death, Marcie Ann Renner became the next trustee. She owned a party store located next door to Jerry Sumpter's law office; although she operated the store, her husband kept the

books and handled the finances. Sumpter stopped by the store on a daily basis, and after DeGroff's death, Sumpter asked Renner if she would act as trustee for his children's Trust. At first Renner replied that she not did have the knowledge to be a trustee. Sumpter told her that she did not need to have knowledge, that Sumpter would teach her, and that he could not sign for the Trust. Renner believed that the Trust assets would pass to the children when they turned eighteen years old. Renner said she became the trustee in the late 1980s.

Renner testified that Sumpter never showed her the Trust document. She did sign income tax returns that Sumpter brought to her. At her suggestion, Sumpter kept a Trust file and he received all the Trust bank statements. Renner never looked at that file. However, Renner was aware that several properties were Trust assets, including the law office building and a house in Bay City, Michigan. Jerry Sumpter's sister lived in the house in Bay City and paid rent to the Trust; rent was collected on the law office as well. In addition, Renner proposed that the Trust open an account at a local bank that had a branch where J.L Sumpter was attending college so that he could have easy access to funds. Sumpter follow Renner's suggestion, and money from the Trust was withdrawn and placed in the account for J.L. Sumpter. Renner signed tax returns for the Trust, but the Trust records were kept at Jerry Sumpter's law office.

While Renner was trustee, the Trust acquired real estate located on Lake Huron known as 1444 Nicolet Drive, Cheboygan, Michigan. At Sumpter's request, Renner went to look at the house, accompanied by Laura Arnold, Sumpter's secretary. This property was owned by Robert and Patricia Griffith, who originally agreed to sell it to Jerry Sumpter for $63,000. The parties stipulated that if Patricia Griffith would have testified at trial, she would have described the transaction as follows: On July 8, 1990, Jerry Sumpter went to the Griffiths' home to inquire about purchasing 1444 Nicolet Drive. Mr. Sumpter negotiated with Mr. and Mrs. Griffith a purchase price of $63,000, and he wanted to write a check in that amount for the purchase of the property that very day. The Griffiths informed Sumpter that they had previously sold the property to a woman the year before (i.e., 1989) on a land contract but that the woman had drowned, and they could not sell the property to a new purchaser until authorized to do so by the Cheboygan County Probate Court. Sumpter then drew up a handwritten sales contract, see Joint Ex. 31, and wrote a check to the Griffiths on the account of Sumpter & Perry, P.C. with Straits Area Federal Credit Union in the amount of $1,000 as a deposit. See ibid. Prior to receiving approval from the probate court to sell the property, the Griffiths engaged the services of Cheboygan Title Company to handle the sales transaction and closing. The Griffiths first became aware that the property was to be placed in the name of the Trust on July 31, 1990, the date of the closing and all the closing documents were prepared with the understanding that the sale was to be to Jerry Sumpter. On July 31, 1990, the closing documents were changed to reflect that the property was to be placed in the name of the Trust. The closing also transpired with the understanding that the proceeds from the sale in the amount of $62,633.69 were to be held in escrow by Cheboygan Title until a hearing on the Griffiths' request to have the Nicolet property reconveyed to them was held in probate court on August 6, 1990. See Joint Ex. 32. The sale was consummated as anticipated. See Joint Ex. 29. The only person the Griffiths dealt with regarding their sale of the Nicolet property was Jerry Sumpter.

Renner testified, and the documents reflect, that she signed the closing papers for the transfer of the property. Jerry Sumpter was to live in the property and pay rent, although Renner did not know if he paid the rent. She did testify that rent on the Lake Huron (Nicolet) property was paid to the Trust, as it was paid on the Bay City house and the law office. There is a lease obligating Jerry Sumpter to pay rent to the Trust on the Nicolet property at the rate of $500 per month (countersigned by Renner as trustee). *See* Joint Ex. 28. In addition, the plaintiffs' summary of accounts reflects the payment of rent on the Nicolet property at $500 per month, as well as on the office building and the Bay City house. *See* Pls.' Ex. F.

Another real estate transaction also took place during Renner's tenure as trustee. On January 22, 1993, the property at 10841 Moonlight Bay Road, Cheboygan, Michigan was conveyed to the Trust by warranty deed. This property included vacant lots 46, 47, and 48 (and an undivided 4/57ths of Lot 58) in which Jerry and Santina Sumpter previously had a land contract vendee's interest, which was conveyed to the Trust in the April 21, 1988 transfer extinguishing the $90,000 mortgage. This property was located near the marital home of Jerry and Santina Sumpter at 10805 Moonlight Bay Road, which was never transferred to the Trust. The parties stipulated that the sellers of these lots, Dr. Rateb and Laura Homsi, if they had testified at trial, would have stated as follows: On August 31, 1978, Dr. and Mrs. Homsi sold four parcels of vacant land on land contract to Jerry and Santina Sumpter. *See* Joint Ex. 8. One of the lots was located at 10841 Moonlight Bay Road and the other three lots were nearby on Sharill Road in Cheboygan, Michigan. As far as they can recall, all payments came from Jerry Sumpter's law office and were drawn on a law office checking account. Some of the checks were signed by Jerry Sumpter

and others by a secretary. Dr. and Mrs. Homsi did not know that the property had been transferred to the Trust or that the Trust existed until Jerry Sumpter instructed them to convey the property to the Trust in January 1993 upon full payment of the amount due under the land contract.

Renner was aware that the Trust would terminate by its own terms when the younger of Jerry and Santina Sumpter's two children, Shaundra, turned eighteen. Renner testified that "the girls in Jerry's office were writing up the papers" to turn over the property to the children. The Trust dissolved in 1994, and Renner ceased being the trustee at that time.

Jerry and Santina Sumpter also attempted to avoid their tax obligation by seeking protection in bankruptcy court. IRS Agent Don Allen Wood testified that Sumpter's case was assigned to him in November 1988 to investigate the offer and compromise. Wood spoke to Jerry Sumpter by telephone and met Sumpter in his law office. Wood asked for more information regarding the mortgage given on the six lots and the transfer of that property to the Trust, but Wood never received additional proof. Wood testified that when he met with Sumpter, Sumpter asked Wood, "What do I have to do to not pay this?" Sumpter had already submitted an offer and compromise unsuccessfully, and he thought "there must be something" he could do. Wood told Sumpter that income tax obligations could be discharged in bankruptcy, but Sumpter could not obtain a discharge because he was not insolvent. Sumpter expressed surprise to Wood that taxes were dischargeable. Wood testified that he signed a notice of levy to Sumpter's law firm to seize wages payable to Sumpter. The levy was not successful.

On September 27, 1989, Jerry and Santina Sumpter filed a Chapter 7 bankruptcy petition in the United States Bankruptcy

Court for the Eastern District of Michigan seeking a discharge of their debts, including their federal tax liabilities. In December 1989, the United States brought a four-count adversary proceeding against Jerry and Santina Sumpter individually to prevent the discharge of their tax liability under 11 U.S.C. § 523(a)(1)(c). This section of the Bankruptcy Code prevents the discharge of a federal tax liability where a taxpayer has attempted to willfully evade or defeat the payment of their federal income tax.

The bankruptcy court granted summary judgment in favor of the United States and against Jerry Sumpter. After a trial, Santina Sumpter was also found to have willfully attempted to evade and defeat the payment of her Federal income taxes. This Court affirmed the decisions of the bankruptcy court, and both Sumpters then appealed to the United States Court of Appeals for the Sixth Circuit. That court affirmed the judgment against Jerry Sumpter but reversed the judgment against Santina Sumpter, reasoning that she was a relatively uneducated woman from Italy who deferred to her husband's wishes on nearly all matters and had little knowledge or control of the circumstances surrounding Jerry Sumpter's business in general or the April 1988 transfers in particular. Santina Sumpter was later determined to be an "innocent spouse" pursuant to 26 U.S.C. § 6013 by the IRS, and the assessments against her were abated and the liens released.

Jerry and Santina Sumpter divorced in April 1995, which occurred after the Trust dissolved. The Judgment of Divorce, dated April 28, 1995, was issued after a trial. Included in the judgment was a determination by the court that some of the property at issue in this case belonged to the children, the plaintiffs here, by virtue of the transfers upon the dissolution of the Trust, and it prohibited Jerry Sumpter from us-ing that property for his personal benefit without the permission of the children.

Notices of federal tax lien naming the Trust as the nominee, transferee, or alter ego of Jerry Sumpter were filed with the Register of Deeds for Bay County and Cheboygan County, Michigan, in 1992. On September 8, 1992, the IRS filed a Notice of Lien against Jerry L. and Santina Sumpter, changing the expiration date of the lien refiling. On January 7, 1997, the IRS refiled the April 21, 1988 Notice of Lien against Jerry L. and Santina Sumpter. On September 29, 1997, the IRS filed a Certificate of Release of Federal Tax Lien as to Jerry L. and Santina Sumpter. On September 29, 1997, the IRS filed a Certificate of Release of Federal Tax Lien against the Trust. On October 28, 1997, the IRS filed a Notice of Lien against the Trust as Nominee, Transferee and Alter Ego. On February 2, 2000, the IRS filed a corrected Notice of Federal Tax Lien against the Trust, limiting its lien to certain properties. On January 30, 1997, the IRS filed a Notice of Federal Tax Lien against Jerry L. Sumpter individually for his individual 1995 taxes. Each of these liens were filed both in Cheboygan County and in Bay County, Michigan, and they seek to reach the three groups of property described above.

Plaintiff J.L. Sumpter, 30 years old at the time of trial, testified that he first learned of the Trust at age 15 or 16. He attended Adrian College from 1990–1994. The expenses of his education were paid by the Trust. J.L. said he learned about the purpose and contents of the Trust prior to his mother and father's divorce in 1995. He knew that the Trust was intended to assist him and his sister. He maintained that he looked at Trust records since he was age 15 or 16 because his father was open with the Trust documents. The Trust terminated when his sister

Shaundra turned 18 years old in 1994. The Trust money and property were distributed to J.L. and Shaundra. Since that time, J.L. and Shaundra managed the houses, received rent from the properties, and deposited rent money into a joint checking account. They paid the expenses out of the joint account. J.L. testified that he did not give any of the Trust's assets to his mother or father.

J.L acknowledged that Jerry Sumpter kept Trust records in his law office. He said the records remained there even after the Trust terminated. J.L said that his father methodically kept records on the Trust properties: each rental had its own file; when a rent check was received or an expense incurred, it was recorded on a ledger and then put in the file; the ledger would then be taken to an accountant at year end. The information from the ledger was summarized on Plaintiffs' Exhibit F, but the ledger and underlying support documentation could not be found. J.L insisted, however, that he regularly reviewed this information with his father since 1989. He said he knew his father was paying rent to the Trust on the Nicolet property and the office building because he saw his father write checks to the Trust, and he saw bank statements reflecting deposits. Jerry Sumpter resided in the Nicolet house after it was purchased on July 31, 1990, and he paid rent to the trust.

J.L. Sumpter testified that he never heard that the trust was not for a real purpose. Jerry Sumpter did not mention to J.L. that the IRS had audited his tax returns and wanted to assess additional taxes. J.L.'s parents did not tell him that they were involved in litigation involving taxes owed to the IRS. J.L. said that he has not heard from his father since he left the country in November 1995. J.L explained that Laura Arnold, Jerry Sumpter's secretary, had a personal relationship with Sumpter and they had a child together. Laura Arnold disappeared with Sumpter. She is no relation to Judy Arnold, who worked as a secretary in Sumpter's law office and witnessed the execution of the Trust document in 1979. *See* Joint Ex. 1.

J.L. acknowledged that in addition to the real estate, he received $95,000 when Shaundra turned 18 years old and the Trust terminated. The money was transferred to a Dreyfus account three years earlier. *See* Pls.' Ex. N–7. The Dreyfus account statements went to Jerry Sumpter's law office. J.L stated that he loaned some of that money to Jerry Sumpter to buy a boat in 1992 for which Jerry Sumpter signed a promissory note. *See* Pls.' Ex. N–1. After Jerry Sumpter disappeared, J.L. filed suit to seize the boat claiming an equitable mortgage, and he eventually recovered the boat and sold it. *See* Pls.' Ex. N–2, N–4, N–5.

Shaundra Sumpter testified that she was 26 years old at the time of trial. She first found out about the Trust in her early teens. She said that no one told her that the Trust was not genuine. She said that her father explained that the purpose of the Trust was to pay for her education and to help her but a car. Shaundra attended college and her tuition was paid by the Trust. She received proceeds from the trust when it was dissolved; she testified that she has not given any of the proceeds to her mother or father. Shaundra said that she spoke with the trustees and saw them sign papers for the Trust. Shaundra did not know that her father owed taxes and only learned about the tax debt at the time of her parents divorce. Shaundra has not had contact with Jerry Sumpter since he disappeared.

After the record was closed, the plaintiffs filed a motion to reopen the record to introduce additional documentation that

purported to show that Jerry Sumpter had made payments on the promissory note given on the boat loan. The defendant has not concurred in that motion, and the Court does not believe that the evidence is necessary to a decision. The plaintiffs rested at trial; the decision to reopen the proofs requires the Court to exercise discretion. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Noble v. National Mines Corp.*, 774 F.2d 144, 149 (6th Cir.1985) (stating that the decision to re-open the record is one committed to the sound discretion of the trial court); *County of Oakland by Kuhn v. Vista Disposal, Inc.*, 875 F.Supp. 410, 413 (E.D.Mich.1995). Because the evidence is not necessary for the decision of this case, the motion will be denied. *See Ramsey v. United Mine Workers of America*, 481 F.2d 742, 753 (6th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 473 (1973) (noting that the significance of the evidence that a party seeks to admit should be considered in determining a motion to reopen proofs).

## II.

The plaintiffs initially have raised the argument that the United States lacks standing to bring its counterclaim seeking to set aside the conveyances from Jerry and Santina Sumpter to the Trust on the grounds of fraudulent transfer and alter ego. The plaintiffs assert that this Court lacks jurisdiction to grant the IRS relief on the fraudulent conveyance and alter ego claims because "the IRS did not have the Bankruptcy Trustee bring the action in the Bankruptcy Court and because the cause[s] of action [fraudulent conveyance and alter ego] w[ere] never formally abandoned or transferred to the IRS by the Bankruptcy Trustee." Pl.s' Supp. Br. on Standing at 1–2. Thus, the plaintiffs contend, the trustee in Jerry Sumpter's bankruptcy is the real party in interest and is the only party that has standing to bring

the fraudulent conveyance and alter ego claims. The plaintiffs rely on *Hatchett v. United States*, No. 94–74708, 1997 WL 397730 (E.D.Mich.1997) (holding that "given that the Bankruptcy Trustee did not pursue the fraudulent conveyance allegations, the United States, an individual creditor, does not have standing to pursue a fraudulent conveyance defense"), *In re Cundiff*, 227 B.R. 476 (6th Cir. BAP 1998) (stating that "standing is a jurisdictional element which cannot be waived and can be reached at any time"), and *In re R & L Wood Products Inc.*, 156 F.3d 1231 (6th Cir.1998) (unpublished) (holding that only the trustee has the exclusive authority to make claims on behalf of the estate and the failure of the trustee to institute proceedings to recover property does not give the creditors the right to institute such proceedings), to support their argument.

■ After the plaintiffs submitted their filings on this issue, the court of appeals decided *Hatchett v. United States*, 330 F.3d 875 (6th Cir.2003), which reversed the district court on a similar standing issue and held that "[alt]hough the trustee has the exclusive right to bring an action for fraudulent conveyance during the pendency of the bankruptcy proceedings, the Bankruptcy Code does not extinguish the right of the Government to bring a state law action for fraudulent conveyance after the debtor receives a discharge in bankruptcy." *Id.* at 886. The standing question in this case is governed by *Hatchett*, which speaks directly to the issue. Here, a bankruptcy discharge was issued and the bankruptcy case terminated following the decision of the court of appeals on August 22, 1995 and the issuance of the mandate. The plaintiffs filed their complaint to quiet title in this case in the Cheboygan County Circuit Court on April 10, 2001. The United States removed this case on May 18, 2001, and filed its counterclaim thereafter.

The United States has standing to bring its claims.

## III.

Citizens of the States may bring an action in any appropriate state court or United States district court against the United States to quiet title in land in which the United States claims an interest by virtue of a lien or otherwise. *See* 28 U.S.C. § 2410. Such actions, when brought in state court, are removable to federal court. *See* 28 U.S.C. § 1444.

 The Michigan legislature has established a statutory cause of action to quiet title by Mich. Comp. Laws § 600.2932(1), which states that "[a]ny person, whether he is in possession of the land in question or not, who claims any right in, title to, equitable title to, interest in, or right to possession of land, may bring an action in the circuit courts against any other person who claims or might claim any interest inconsistent with the interest claimed by the plaintiff." This statute "codifie[s] actions to quiet title and authorize[s] suits to determine competing parties' respective interests in land." *Republic Bank v. Modular One L.L.C.*, 232 Mich. App. 444, 448, 591 N.W.2d 335 (1998), *overruled on other grounds by, Stokes v. Millen Roofing Co.*, 466 Mich. 660, 649 N.W.2d 371 (2002). The plaintiffs have the burden of proof in a quiet title action, and they must make out a prima facie case of title. *Beulah Hoagland Appleton Qualified Pers. Residence Trust v. Emmet Co. Rd. Comm'n*, 236 Mich.App. 546, 550, 600 N.W.2d 698, 701 (1999) (citing *Stinebaugh v. Bristol*, 132 Mich.App. 311, 316, 347 N.W.2d 219 (1984)). If the plaintiffs establish a prima facie case, the burden of proof shifts to the defendant to establish that the defendant has superior right or title to the property. *Beulah*, 236 Mich. App. at 550, 600 N.W.2d at 701 (citing *Boekeloo v. Kuschinski*, 117 Mich.App. 619, 629, 324 N.W.2d 104 (1982)). An action to quiet title is equitable in nature. *Ibid.* If a defendant fails in its proof and "the plaintiff established his title to the lands, the defendant shall be ordered to release to the plaintiff all claims thereto." Mich. Comp. Laws § 600.2932(3).

## A.

The Court finds in this case that the plaintiffs have come forward with satisfactory evidence of title to all the properties alleged in the complaint to establish a prima facie case of entitlement. All the property was conveyed to the Trust, and the terms of the Trust provide for conveyance of the Trust assets to the plaintiffs when the younger of them, Shaundra, attained eighteen years. Shaundra was twenty-five years old when the complaint was filed. There may have been a colorable dispute over whether Jerry and Santina Sumpter actually placed the law office building in the Trust when it was established in 1979, due to the contention that the land and building initially had been conveyed to a law firm's retirement trust. However, that issue was resolved in a state court quiet title action in favor of the plaintiffs in this case in 1999, and the judgment in that case establishes title to the property in the plaintiffs. *See* Pls.' Ex. A1 & A2.

## B.

 Since the plaintiffs have made out a prima facie case, the United States has the burden of proving the superiority of its interest in the properties by virtue of its tax liens or otherwise. A federal tax lien arises when unpaid taxes are assessed and continues until the resulting liability is either satisfied or becomes unenforceable due to the running of the statute of limitations. *See* 26 U.S.C. §§ 6321 and 6322; 26 C.F.R. § 301.6321–1. The lien attaches to all property and property rights that the

taxpayer then holds or subsequently acquires. *Ibid.* Once a tax lien attaches to property, it remains with the property despite subsequent transfers unless the property is sold to a bona fide purchaser for value before the notice of lien is filed. State law governs the determination of the nature of the legal interest that the taxpayer has in the property to which the lien attaches. *United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985); *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); *United States v. Cache Valley Bank,* 866 F.2d 1242, 1244 (10th Cir.1989); *Wolfe v. United States,* 798 F.2d 1241, 1244 n. 3 (9th Cir.1986). Once the court determines the nature of the legal interest conferred by state law, the consequences are governed by federal law. *United States v. Nat'l Bank of Commerce, supra,* 472 U.S. at 727, 105 S.Ct. 2919; *United States v. Rodgers,* 461 U.S. 677, 683, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983); *Aquilino v. United States, supra,* 363 U.S. at 513–14, 80 S.Ct. 1277.

▮ A tax lien does not attach to property that a taxpayer has previously transferred and that no longer belongs to him. However, where property is placed in the name of another as the taxpayer's alter ego or nominee, the lien attaches to the property. *See e.g. G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350–51, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *Lemaster v. United States,* 891 F.2d 115, 119 (6th Cir.1989). Therefore, the United States can enforce a taxpayer's liability for taxes against property held for him by his nominee or alter ego. *Ibid; see Porta–John of America, Inc. v. United States,* 4 F.Supp.2d 688 (E.D.Mich.1998); *see also Shades Ridge Holding Co., Inc. v. United States,* 888 F.2d 725, 729 (11th Cir.1989), *cert. denied sub nom., Fiorella v. United States,* 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990); *F.P.P. Enterprises v. United States,* 830 F.2d 114, 117–18 (8th Cir.1987); *Loving Saviour Church v. United States,* 728 F.2d 1085, 1086 (8th Cir. 1984).

▮ Similarly, when a taxpayer has fraudulently disposed of property prior to the establishment of a federal tax lien, the United States is entitled to rely upon the State's fraudulent conveyance laws where the property is located to determine whether the taxpayer has an interest in the property. *See e.g., C.I.R. v. Stern,* 357 U.S. 39, 45–47, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958); *United States v. Fernon,* 640 F.2d 609, 611–12 (5th Cir.1981); *United States v. Kaplan,* 277 F.2d 405, 408 (5th Cir.1960). Thus, courts may look beyond nominal title to determine whether a taxpayer has retained an interest in the property.

1.

"Alter ego means 'other self'—where one person or entity acts like, or, for another to the extent that they may be considered identical." *United States v. Scherping,* 187 F.3d 796, 801 (8th Cir. 1999), *cert. denied,* 528 U.S. 1162, 120 S.Ct. 1175, 145 L.Ed.2d 1084 (2000) (quoting *Loving Saviour Church v. U.S.,* 556 F.Supp. 688, 691 (D.S.D.1983)), *aff'd,* 728 F.2d 1085 (8th Cir.1984) (per curiam). A "nominee" is a person or entity who holds legal title to property that in truth belongs to another who exercises control over and realizes the benefit of it. "Nominee status is determined by the degree to which a party exercises control over an entity and its assets." *United States v. Bell,* 27 F.Supp.2d 1191, 1195 (E.D.Cal.1998) (citing *Shades Ridge Holding Co.,* 888 F.2d at 729). Although many courts have conflated these two theories, *see Baum Hydraulics Corp. v. United States,* 280 F.Supp.2d 910, 917 (D.Neb.2003) (suggesting that "because of the similar inquiry involved in the alter ego and nominee analyses, courts

have blurred the two concepts"), it has been suggested that "[w]hereas nominee theory focuses on the relationship between the taxpayer and the property, the focus of the alter ego doctrine is between the taxpayer and the entity." *Tri–State Equipment v. United States*, 1997 WL 375264, at *12 (E.D.Cal.1997) (unpublished); *see also Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir.2000) (stating that "[w]hile related, the concepts of 'nominee', 'transferee', and 'alter ego' are independent bases for attaching the property of a third party in satisfaction of a delinquent taxpayer's liability. A nominee theory involves the determination of the true beneficial ownership of property. An alter ego theory focuses more on those facts associated with a 'piercing the corporate veil' analysis.").

In the circumstances of this case, the distinction between the two theories is largely immaterial. *See Baum Hydraulics*, 280 F.Supp.2d at 917 (noting that the "court's review of the case law and secondary authorities elicits no significant practical differences between the terms 'nominee' and 'alter ego'"). A court presented with a nominee or alter ego claim "attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another [person or entity] while, in actuality, retaining all or some of the benefits of being the true owner." *In re Richards*, 231 B.R. 571, 578 (E.D.Pa.1999). Another judge of this Court has succinctly summarized the six factors considered by courts in determining the claim:

(1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor;

(4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Porta–John of America Inc.*, 4 F.Supp.2d at 701 (citing *LiButti v. United States*, 968 F.Supp. 71, 76 (N.D.N.Y.1997), and *Towe Antique Ford Foundation v. IRS*, 791 F.Supp. 1450, 1454 (D.Mont.1992), *aff'd*, 999 F.2d 1387 (9th Cir.1993)). *See also LiButti v. United States*, 107 F.3d 110, 119–120 (2d Cir.1997).

In this case, the Court finds that Jerry Sumpter retained great influence over the Trust by selecting trustees that would defer to his decisions, either because of their lack of experience or their familiarity with him. Thereby, Sumpter reasonably could be assured that the liquid funds in the Trust would be made available for the use of his law practice and to purchase assets that he might wish to acquire. For instance, the record indicates that the law practice used funds in the Trust for operations and equipment purchases. Cash from the Trust was used to purchase the lakefront home on Lake Huron (the Nicolet Drive property) where Jerry Sumpter lived after he separated from Santina. However, these factors do not necessarily establish that the Trust was Sumpter's nominee in the various transactions or served as his alter ego. The money used by the law practice was taken in the form of loans that were paid back to the Trust with interest. The Nicolet property was purchased in the name of the Trust on July 31, 1990. The Trust paid out $62,633.69 of its cash assets to acquire the property, which included various credits and closing expenses. Marcie Renner, who was the Trustee at that time, wrote the check out of the Trust account. Prior to the check being written, the Trust had funds in the MBNA bank account in the amount of $94,830.12. Although Jerry

Sumpter lived in that house, he signed a lease and paid a fair rental value for its use.

Likewise, Sumpter continued to use the law office building located at 11118 Straits Highway, Cheboygan, Michigan as his business location after it was placed in the Trust in 1979. However, Sumpter's law practice paid rent for the use of the building. Sumpter did not receive the rent payments himself, and therefore he and Santina did not retain the benefits of the property. The transfer was not recorded until Sumpter determined that it had to be placed beyond the reach of creditors in 1988, but that does not diminish the validity of the initial gift to the children's Trust. Although Sumpter apparently attempted to disavow the earlier conveyance in 1996 when he signed a quit claim deed transferring the interest in the property of the Sumpter, Harrington and Loznak Retirement Trust to Jaala Sumpter (the daughter of Jerry Sumpter and Laura Arnold), that attempt was rebuffed by the Cheboygan County Circuit Court, which held that the J.L. & Shaundra Sumpter Trust had been the grantee of any interest of Jerry L. Sumpter and Santina Sumpter and the Sumpter, Harrington & Loznak, P.C., Retirement Trust or the Sumpter, Harrington & Loznak Retirement Account as of May 1, 1979 and recorded on April 26, 1988.

Although the Trust loaned Jerry and Santina Sumpter $90,000 in January 1988 in contravention of the provision that authorized the trustee to make loans "other than loans, directly or indirectly, to the Settlor," Joint Ex. 1 ¶ 3, the Sumpters nonetheless gave the Trust a mortgage on six pieces of property. The loan was repaid by the conveyance of that property, which constituted fair consideration for the money borrowed. The property at 10841 Moonlight Bay Road, Cheboygan, Michigan, which had been the marital home of Jerry and Santina Sumpter, was not used by them after it was transferred to the Trust in 1988. The Sumpters never received any benefit from the property after it was transferred to the Trust. The vacant pieces of land that were transferred to the Trust in 1988 were originally purchased by Jerry and Santina Sumpter for prices of $2,000, $126,500 and $5,000. Likewise, the Sumpters never used or received any benefit from the property after it was transferred to the Trust. Jerry and Santina Sumpter originally purchased the house in Bangor Township, in 1985 for $35,000. The Sumpters never used, lived in, or received any benefit from the property after it was transferred to the Trust. All rents that the property generated were deposited in the Trust's account. The Trust paid all the expenses relating to the property.

When J.L Sumpter reached 21 years of age in 1991, he received approximately $97,000 from the Trust. None of that money went to the settlors. Likewise, Shaundra Sumpter received a distribution when the Trust dissolved in 1994, and no part of those funds went to her parents.

■ The plaintiffs argue that the bankruptcy court found that the Trust was not the alter ego of Jerry or Santina Sumpter and that the property transferred in lieu of foreclosure of the $90,000 loan constituted fair consideration. The plaintiffs conclude, therefore, that the United States is barred by the doctrine of collateral estoppel from asserting its alter ego claim. This Court need not address this argument because the Court finds from the evidence before it that the Trust was a legal entity separate and apart from Jerry and Santina Sumpter. Although Jerry Sumpter had attempted to orchestrate the functioning of the Trust so that he maintained an influence over its operation, the Trust nonetheless retained the features of

an independent entity. Sumpter irrevocably alienated his property to the Trust, which paid fair consideration for the transfers. Upon transfer, Jerry and Santina Sumpter thereby ceased to enjoy the benefits or shoulder the burdens of the property. The Trust paid the expenses to maintain the property, received rents, and paid taxes. Upon dissolution, the intended beneficiaries of the Trust received its assets free from any actual or equitable claim against them by the settlors.

The United States has not carried its burden of establishing that the Trust was the nominee or alter ego of Jerry Sumpter. The Court, therefore, finds in favor of the plaintiffs on this claim.

### 2.

The governing statutory law of fraudulent conveyances in Michigan at the time of the real estate transfers in this case was Mich. Comp. Laws § 566.14, which defines constructive fraud, and Mich. Comp. Laws § 566.17, which defines actual fraud. These provisions were repealed in 1998 when Michigan adopted the Uniform Fraudulent Transfer Act, but the changes in the definitions of these terms are largely immaterial. *See* Mich. Comp. Laws §§ 566.34 and 566.35; *In re Hurtado,* 342 F.3d 528, 532 n. 1 (6th Cir.2003).

Under Section 566.14, a transfer of property "by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation incurred without a fair consideration." Mich. Comp. Laws § 566.14 (1998). As noted above, the Court has found that all the property transferred, save the law office building, was conveyed for adequate consideration. There is no evidence that the transfer of the law office building in 1979 made Jerry and Santina Sumpter insolvent. The Court finds, therefore, that none of the transfers constituted constructive fraud as that term is defined by Michigan law.

A transfer of property can also be fraudulent to the transferor's creditors if it is made "with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors." Mich. Comp. Laws § 566.17 (1998). Actual intent to hinder, delay or defraud may be difficult to prove by direct evidence, especially in a case such as this where the transferor is unavailable. Consequently, courts generally rely on the traditional "badges of fraud" to establish fraudulent intent. *See United States v. Rode,* 749 F.Supp. 1483, 1493 (W.D.Mich. 1990), aff'd by unpublished opinion, 943 F.2d 53 (6th Cir.1991); *United States v. Leggett,* 292 F.2d 423, 426 (6th Cir.1961).

The "badges of fraud" have been found to include inadequacy of consideration, secret or hurried transactions not in the usual mode of doing business, and the use of dummies or fictitious parties. *See Leggett,* 292 F.2d at 427. Reservation of benefits, control or dominion of the property by the debtor, insolvency of the debtor, and pendency or threat of litigation at the time of the transfer are other badges of fraud. *In re Otis & Edwards, P.C.,* 115 B.R. 900, 913 (Bankr.E.D.Mich.1990). A concurrence of several badges of fraud "will always make out a strong case." *Leggett,* 292 F.2d at 427 (quoting *Timmer v. Pietrzyk,* 272 Mich. 238, 242, 261 N.W. 313, 314 (1935)). Transactions between family members affecting the rights of creditors are generally subjected to close scrutiny. *Kelley v. Thomas Solvent Co.,* 722 F.Supp. 1492, 1499 (W.D.Mich.1989), citing *Linke v. Goodrich,* 30 Mich.App. 228, 186 N.W.2d 5 (1971); *Bentley v. Caille,* 289 Mich. 74, 286 N.W. 163 (1939). These badges of fraud plus others identified by courts are now enumerated in the current Michigan statute. *See* Mich.

Comp. Laws § 566.34(2) (listing as factors "[t]he transfer or obligation was to an insider;" "[t]he debtor retain[ing] possession or control of the property transferred after the transfer;" concealment of the transfer or obligation; actual or threatened litigation "[b]efore the transfer was made or obligation was incurred;" "[t]he transfer was of substantially all of the debtor's assets;" "[t]he debtor absconded;" "[t]he debtor removed or concealed assets;" "[t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;" "[t]he transfer occurred shortly before or shortly after a substantial debt was incurred;" and "[t]he debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.")

When a conveyance or transfer of property is fraudulent as to a creditor, that creditor may "[h]ave the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim," or he may "[d]isregard the conveyance and attach or levy execution upon the property conveyed." Mich. Comp. Laws § 566.19 (1998).

The Unites States does not claim that the transfer of the office building to the Trust in 1979 is a fraudulent conveyance. The Court finds that the transfer occurred before any tax liability, or the prospect of liens and levies, arose. The Court also finds that the Trust document was signed on May 1, 1979, as indicated on the face thereof, and that the parties intended to convey the law office property to the Trust at that time. It is apparent to the Court that the Trust document was not notarized until the need to record it arose, and that Laura Arnold signed the acknowledgment some time in 1988 to put the document in recordable form. However, the Court is satisfied that the law office property was the first and primary asset conveyed to the

Trust in 1979 for the purposes set forth in the Trust agreement, that is, to create a trust for the benefit of the settlors' children, and not to place the settlors' property beyond the reach of creditors, specifically the IRS. The Court also finds from the evidence that the settlors' intent in creating the Trust was to provide for their children's education and future support, and not to defraud creditors or inhibit the collection of present or future debts.

The transfer of the six parcels of land in 1988 is entirely another matter. The Court finds that the transfer of Jerry Sumpter's interest in the six parcels that were conveyed to the Trust on April 22, 1988 was made with the actual intent to defeat the IRS's claim against him and hinder collection. Although the April 1988 transfers were made for adequate consideration, that is, cancellation of an antecedent debt, the Court believes that the entire transaction beginning with the loan approximately three months earlier must be examined in order to assess whether the transfer exhibited the traditional badges of fraud.

The evidence at trial indicates that Jerry Sumpter received a notice of tax delinquency from the IRS for 1981, 1982, and 1984 in late December, 1987. A couple of weeks after that, the $90,000 loan was made and the indentures for the property in Cheboygan and Bay Counties were executed on January 11, 1988. These mortgages were recorded on January 12, 1988 in Cheboygan County and January 16, 1988 in Bay County. *See* Joint Ex. 25, 26. On April 7, 1988, the IRS sent Sumpter a notice of intent to levy, and on April 21, 1988 IRS Revenue Officer Kenneth Neumann met with Sumpter and advised him that the IRS was about to commence collection proceedings. It was several hours after the meeting between Neumann and Sumpter on April 21, 1988 that the Sump-

ters' interests in the six parcels of land were conveyed to the Trust.

In addition, the loan itself was made to Jerry and Santina Sumpter individually. The evidence in the record is that the loan proceeds were used to pay expenses for Jerry Sumpter's law office. However, when there was a need in the past to use the funds in the Trust for the law firm, the law firm itself borrowed the money directly from the Trust and paid it back. This Court cannot discern a reason for departing from that practice in January 1988, except to provide a means to encumber Sumpter's personal assets and create a vehicle to convey that encumbered property into the Trust, beyond the reach of the IRS.

The loan transaction, including the conveyance of the mortgages on Sumpters' interest in the real estate, was unusual in another respect, since the Trust document prohibited the trustee from making loans to the settlors. Engaging in this prohibited transaction is even less sensible when the money could have been borrowed from the Trust by the law firm. The Court finds that the true purpose of the loan was to set up the later transaction in which the loan collateral—Sumpter's interest in the six lots—was transferred to the Trust in lieu of repayment.

■ The plaintiffs argue that the property was transferred to the Trust for adequate consideration, and that the Michigan fraudulent conveyance statutes in effect at the time did not prohibit a debtor from preferring one creditor over another. *See Advance Dry Wall Co. v. Regency Homes, Inc.,* 20 Mich.App. 80, 83–84, 173 N.W.2d 827, 828 (1969) (citing *John A. Parks Co. v. General Discount Corp.,* 294 Mich. 316, 330, 293 N.W. 663, 668 (1940)) (observing that under Michigan law, "a corporation may make preferential payment to its officers and directors even though such preferences are given on the eve of insolvency

and are in payment of antecedent debts"). They posit that transferring the property to the Trust was simply an act preferring the Trust as a creditor over the IRS. The argument is correct as far as it goes, but it ignores the initial loan transaction and the circumstances surrounding it, all of which must be considered in the circumstances. The Court is convinced that the transfers of the six parcels of property into the Trust was simply the last act in a series of transactions that were designed to hinder, delay and defraud the IRS as a creditor of Jerry Sumpter.

The plaintiffs argue that the United States may not seek to enforce its tax lien on these properties because the IRS released the liens on September 29, 1997, only to refile them on October 28, 1997. However, a claim that property was alienated as a fraud on creditors is not dependent on the existence of a lien or recorded encumbrance, and the release of the tax liens is immaterial in the circumstances of this case.

■ The acquisition of the property on Nicolet Drive presents a much closer question. Sumpter never had an ownership interest in that land, although it is clear that he alone negotiated for its purchase. The United States argues that Sumpter purchased the property and then had it titled in the name of the Trust, but the evidence does not support that claim. The funds for the purchase of the house and land came directly from the Trust; the closing documents were all executed by the trustee on behalf of the Trust; and the property was deeded to the Trust. The property was acquired from unrelated third parties for fair value. Moreover, the purchase of the property was closed on July 31, 1990. The liens and assessments had been in place for over two years, and there is no inference of fraud that can be drawn from the timing of the transaction.

The fact that Jerry Sumpter apparently needed a place to live after he separated from Santina and chose to rent a residence from the Trust rather than a stranger does not render the transaction inherently suspect or compel an inference of fraudulent intent. The Trust acquired an asset likely to appreciate in value, and the asset generated income due to the one-year lease calling for rent at $500 per month.

The Court concludes that the United States did not sustain its burden of proof as to its claim that the transaction involving the Nicolet Drive property constituted a fraudulent conveyance.

## IV.

It appears from the evidence presented that the amount of Jerry Sumpter's delinquent tax obligation exceeds the likely value of the six parcels of real estate that the Court has found were fraudulently conveyed to the Trust. However, that fact does not permit the United States to take possession and title to the property. The parties have stipulated that on the date of each assessment referenced above, a federal tax lien arose pursuant to 26 U.S.C. §§ 6321 and 6322, and attached to all property and rights to property belonging to Jerry Sumpter. Santina Sumpter, on the other hand, who owned an undivided half interest in the property at the time of the conveyances, was declared an "innocent spouse" pursuant to 26 U.S.C. § 6013 by the IRS, thereby enabling the assessments against her to be abated and the liens released. In fact, Santina Sumpter received a Certificate of Discharge from the IRS dated December 31, 1998. The IRS, therefore, was not a creditor of Santina Sumpter and the conveyance of her interest in the six lots to the Trust did not constitute a fraudulent conveyance.

▮ As mentioned earlier, under Michigan law when a conveyance is fraudulent the conveyance may be set aside as to that creditor "to the extent necessary to satisfy his claim," or the creditor may "[d]isregard the conveyance and attach or levy execution upon the property conveyed." Mich. Comp. Laws § 566.19 (1998). Consequently, the United States may look only to Jerry Sumpter's interest in the asset— one-half its value—to satisfy its claim. *See United States v. Craft*, 535 U.S. 274, 288, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (holding that a federal tax lien attaches to the delinquent taxpayer's interest in property held by the taxpayer and an innocent spouse by the entireties under 26 U.S.C. § 6231); *United States v. Rodgers*, 461 U.S. 677, 689–94, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) (holding that although 26 U.S.C. § 6321 allowed the government to force a sale of jointly held homestead property to satisfy the tax obligation of one of the joint tenants, the government must take steps to compensate the nondelinquent spouse for her interest in the property); *United States v. Certain Real Property Located at 2525 Leroy Lane, West Bloomfield, Mich.*, 910 F.2d 343, 349 (6th Cir.1990) (acknowledging that the government could prosecute a forfeiture proceeding against property held by the entireties but providing that it would have a lien on the property only to the extent of the value of the wrongdoer's interest).

▮ In addition, the plaintiffs argue that even if the conveyance of any of the property to the Trust is set aside as fraudulent, they are entitled to set off an amount for maintenance and improvements spent on the property. As a general rule, a trust that receives property from a grantor as part of a fraudulent conveyance is not entitled, as against grantor's creditors when the conveyance is set aside, to reimbursement for expenditures made by it for payment of taxes or improvements made to the property and cannot impose a lien on the property if the trust

actively participated in the fraud. However, if the trust did not participate in the fraud it is entitled to reimbursement for taxes and other expenditures. *See Bank of Atkins v. Teague,* 205 Ark. 38, 166 S.W.2d 1017, 1018 (1942) (holding that a grantee who has actively participated in a fraudulent conveyance is not entitled, as against the grantor's creditors, when the conveyance is set aside, to reimbursement for expenditures made by him in payment of taxes and prior encumbrances on the property); *In re Spotless Tavern, Co.,* 4 F.Supp. 752, 755–56 (D.Md.1933) (holding that equitable doctrine that grantee's actual fraud against grantor's creditors disentitles grantee to credit for betterments to property conveyed or taxes, liens, and encumbrances paid is not absolutely inflexible, or invariably applicable); *Lewis v. Barber,* 243 Ky. 519, 49 S.W.2d 328, 329 (1932) (holding that if a grantee accepts property, with knowledge of pending action of fraudulent conveyance against grantor, for the purpose of defrauding the plaintiff, the grantee is not entitled to the property conveyed and cannot place a lien upon the property). *Cf. Loos v. Wilkinson,* 113 N.Y. 485, 21 N.E. 392 (N.Y.Ct.App.1889) (holding that where a conveyance is set aside as fraudulent as to the grantor's creditors, the grantee, on accounting for the rents and profits, is entitled to credit for taxes paid by him, and for repairs made which were necessary for the preservation of the property, and to keep it tenantable, although he was a guilty participant in the fraud). Both of the trustees and the plaintiffs, who were the beneficiaries of the Trust, testified that they had no knowledge of Jerry Sumpter's tax delinquencies or that the Trust was created for other than a legitimate purpose. This testimony was unrebutted. The Court finds, therefore, that the Trust acted without knowledge of the fraud and is entitled to reimbursement for the payment of taxes and other expenditures to maintain the property allocable to Jerry Sumpter's share of the asset.

The plaintiffs offered evidence of payment of property taxes on certain property, *see* Pls.' Ex. G, although neither party addressed the question of how these expenses should be allocated or suggested a formula to calculate the amount of reimbursement. The Court will direct the parties to file briefs addressing the value of the six lots, the appropriate manner of disposition of the property, and the manner of calculating and the amount of the set-off for reimbursement to which the plaintiffs are entitled.

V.

The Court concludes that the J.L. & Shaundra Sumpter Trust was not the nominee or alter ego of Jerry Sumpter. The Court also finds that the land consisting of the office building located at 11118 Straits Highway, Cheboygan, Michigan in which Jerry Sumpter conducted his law practice and the residential property commonly known as 1444 Nicolet, Cheboygan, Michigan were not fraudulently conveyed to the Trust. The Court determines that the six lots consisting of two parcels of land in Inverness Township, Cheboygan County; three parcels in Benton Township, Cheboygan County; and one parcel in Bangor Township, Bay County, described previously, were fraudulently conveyed to the Trust and that the United States is entitled to satisfy its claim for Jerry Sumpter's unpaid federal income taxes from his interest in that property. Finally, the Court determines that there is no need to reopen the record to receive additional proofs on the nominee or alter ego claims.

Accordingly, it is **ORDERED** that the plaintiffs' motion to reopen the record [dkt # 39, 40] is **DENIED.**

It is further **ORDERED** that title to the property commonly known as 11118 Straits

728

Highway, Cheboygan, Michigan and 1444 Nicolet, Cheboygan, Michigan, more particularly described in Paragraph 4 of Count I and Paragraph 4 of Count II of the plaintiffs' complaint, respectively, is quieted in the plaintiffs as tenants in common, and that any and all interest, liens, and encumbrances of the United States are hereby extinguished, set aside, and held for naught.

It is further **ORDERED** that judgment will enter in favor of the United States determining that valid federal tax liens attach to the interest of Jerry Sumpter in six lots consisting of two parcels of land in Inverness Township, Cheboygan County; three parcels in Benton Township, Cheboygan County; and one parcel in Bangor Township, Bay County, described previously, being a one-half interest in said property, subject to appropriate set-offs for reimbursement for expenses noted above as may be determined by the Court at a later time.

It is further **ORDERED** that both parties shall file a brief on or before **March 1, 2004** addressing the value of the six lots, the appropriate manner of disposition of the property, the manner of calculating and the amount of the set-off for reimbursement to which the plaintiffs may be entitled, and the distribution of the proceeds. The parties shall respond to each others' briefs on or before **March 19, 2004.** No replies will be permitted. Entry of judgment shall abide the determination of the questions addressed by the briefs.